248 F.3d 1349 (Fed. Cir. 2001)
 TROY SHOCKLEY, Plaintiff-Cross Appellant,
and
EXCALIBUR TOOL & EQUIPMENT CO., INC., Third Party Defendant-Cross Appellant,
v.
ARCAN, INC., Defendant-Appellant,
and
TELESIS CORPORATION, Defendant/Third Party Plaintiff-Appellant,
and
SUNEX INTERNATIONAL, INC., Defendant/Third Party Plaintiff-Appellee.
 99-1580, -1603
 United States Court of Appeals for the Federal Circuit
 DECIDED: May 9, 2001
 
 Appealed from: United States District Court for the District of South Carolina
 Magistrate Judge William M. Catoe, Jr. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Cort Flint, Cort Flint, P.A., of Greenville, South Carolina, argued for plaintiff-cross appellant Troy Shockley, and third party defendant/cross appellant Excalibur Tool & Equipment Co., Inc. With him on the brief was Douglas W. Kim. Of counsel on the brief was Rodney Pillsbury, Yacobi & Pillsbury, LLC, of Greenville, South Carolina.
 Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendant-appellant Arcan, Inc. and defendant-third party plaintiff-appellant Telesis, and defendant-third party appellee Sunex International, Inc.
 Before RADER, SCHALL, and BRYSON, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 On a motion for summary judgment, the United States District Court for the District of South Carolina upheld the validity of Mr. Shockley's U.S. Patent No. Re. 35,732 (the '732 reissue). Before trial, Arcan, Inc., Telesis Corporation, and Sunex International, Inc. (collectively defendants) conceded that their accused devices contained all limitations of at least one of the asserted claims of the '732 reissue. After a jury trial, the district court awarded Mr. Shockley and Excalibur Tool & Equipment Co., Inc. (collectively plaintiffs) lost profit damages totaling $3,791,070, of which $3,000,000 was future lost profits. The district court denied defendants' motion to remit the damage award. The district court also denied defendants' motion for a new trial on damages.
 
 
 2
 Based on jury findings, the district court granted Arcan intervening rights for sales to Costco, but denied intervening rights for Arcan's sales to Sam's Wholesale Club (Sam's). Finally, the district court denied plaintiffs' motion to clarify that Arcan and Telesis are jointly and severally liable.
 
 
 3
 Because the new rule for reissue patents, 37 C.F.R. § 1.175 (1997) (new Rule 1.175), applies to the '732 reissue, this court affirms the district court's grant of summary judgment that the '732 reissue is not invalid. Because the "offer to sell" language added to 35 U.S.C. § 252 (1994) has not changed the statutory requirement that absolute intervening rights apply only to existing products, this court affirms the district court's denial of absolute intervening rights for Arcan's sales to Sam's. Because defendants did not move for judgment as a matter of law (JMOL) on damages before the jury verdict, this court affirms the district court's denial of defendants' post-verdict motion on damages.
 
 
 4
 However, because the jury's lost profit award was speculative and against the great weight of the evidence, this court vacates the district court's denial of a new trial on damages. On remand, the district court may alternatively offer Mr. Shockley a remitted damage award of $791,070 or a new damages trial. Finally, this court reverses the district court's joint and several liability ruling.
 
 I.
 
 5
 This case features a "mechanic's creeper"-a flat base surface on wheels that enables mechanics to lie on their backs while working under an automobile chassis. The '732 reissue patent discloses a mechanic's creeper, shown below, that transforms from a horizontal creeper position into a vertical seat configuration. Pivoting interlinking connectors between the seat and the base facilitate this transformation. The patented invention thus supports a mechanic in a supine position for work under the automobile, and in a seated position for work on the body of the automobile. [Tabular or Graphical Material Omitted]
 
 
 6
 Mr. Shockley, the inventor of the '732 reissue patent, filed his patent application for a transformable creeper on May 17, 1994. During prosecution, the patent examiner rejected independent claim 1. The examiner, however, offered to allow dependent claims 6 and 11 if rewritten in independent form to include the limitations of independent claim 1. Claim 6 directly depended from claim 1 and was broader in scope than claim 11. Instead of rewriting the broader claim 6, Mr. Shockley's patent attorney rewrote narrower claim 11 in independent form to incorporate the limitations of claim 1. Mr. Shockley's patent attorney also made original claim 6 dependent on claim 11, thereby unnecessarily narrowing the scope of claim 6. The patent issued on September 19, 1995, as U.S. Patent No. 5,451,068 (the '068 patent).
 
 
 7
 In January of 1994, Excalibur, Mr. Shockley's company, began selling the inventive transformable creeper named the "Creep-or-Seat." By October of 1995, transformable creepers similar to the Creep-or-Seat appeared in the United States. Excalibur's competitors imported these creepers from China and sold them at considerably lower prices than the Creep-or-Seat. The imported creepers, however, did not infringe the narrow claims of Mr. Shockley's patent. Recognizing his entitlement to broader claim scope, Mr. Shockley filed a reissue application on May 8, 1996.
 
 
 8
 Mr. Shockley's reissue application contained new claim 14, which is almost identical to claim 1 of the '068 patent, but with certain limitations removed (shown underlined below). Claims 1 and 14 recite:
 
 
 9
 1. A transformable mechanic's creeper for use by a worker, said creeper transforming between a horizontal position for supporting said worker working underneath said automobile in a supine position and a seat position for supporting said worker working in an upright seating position, said creeper comprising:
 
 
 10
 an elongated creeper frame; a base included in said elongated creeper frame;
 
 
 11
 a plurality of castors, depending from said elongated creeper frame, said castors supporting said elongated creeper frame on a work floor providing said elongated creeper frame with mobility;
 
 
 12
 a seat assembly interconnected in said elongated creeper frame with said base;
 
 
 13
 at least one interlinking connector linking said seat assembly and base;
 
 
 14
 said interlinking connector having a first end pivotally connected to said base, and a second end pivotally connected to said seat assembly;
 
 
 15
 said interlinking connector having a first pivot position in which said seat assembly is positioned generally in horizontal alignment with said base to define a creeper position;
 
 
 16
 said interlinking connector having a second pivot position in which said seat assembly is positioned generally in vertical alignment with said base to define a seating position wherein said seat assembly and said base support said worker seated;
 
 
 17
 a first plurality of stops carried by one of said interlinking connector and said base, said first plurality of stops engaging the other of said base and interlinking connector to maintain said interlinking connector above said base; and
 
 
 18
 a second plurality of stops carried by one of said interlinking connector and said seat assembly, said second plurality of stops engaging the other of said seat assembly and interlinking connector to maintain said seat assembly above said base.
 
 
 19
 14. A transformable mechanic's creeper for use by a worker, said creeper transforming between a horizontal position for supporting said worker working underneath said automobile in a supine position and a seat position for supporting said worker working in an upright seating position, said creeper comprising:
 
 
 20
 an elongated creeper frame;
 
 
 21
 a base included in said elongated creeper frame;
 
 
 22
 [a plurality of castors, depending from said elongated creeper frame, said castors supporting said elongated creeper frame on a work floor providing said elongated creeper frame with mobility;]
 
 
 23
 a seat assembly interconnected in said elongated creeper frame with said base;
 
 
 24
 at least one interlinking connector linking said seat assembly and base;
 
 
 25
 said interlinking connector having a first end pivotally connected to said base, and a second end pivotally connected to said seat assembly;
 
 
 26
 said interlinking connector having a first pivot position in which said seat assembly is positioned generally in horizontal alignment with said base to define a creeper position;
 
 
 27
 said interlinking connector having a second pivot position in which said seat assembly is positioned generally in vertical alignment with said base to define a seating position wherein said seat assembly and said base support said worker when seated; and
 
 
 28
 said seat assembly including at least one castor providing said mechanic's creeper mobility when said interlinking connector is in said first pivot position.
 
 
 29
 (emphasis added). Claim 14 of the reissue application is identical to claim 6 of the original application as rewritten in independent form. However, when the '732 reissue patent issued, claim 14 was missing the "plurality of castors" limitation (shown in brackets above).
 
 
 30
 Mr. Shockley's declaration, which accompanied his reissue application, asserted that original claim 6 had been erroneously rewritten as a dependent claim instead of as an independent claim. The reissue examiner rejected Mr. Shockley's reissue claims because his declaration did not specify how this error was made, who made the error, and when the error was discovered, as required by 37 C.F.R. § 1.175(a)(5) (1994) (old Rule 1.175).
 
 
 31
 Mr. Shockley amended his reissue application, adding new claims 15, 16, and 17. Mr. Shockley also filed a second declaration, expanding his explanation of the error that required correction. The examiner again rejected the new claims on the basis that Mr. Shockley's second declaration was also defective. On March 26, 1997, Mr. Shockley's patent attorney met with the reissue examiner. The examiner required changes in the declaration to more clearly explain the way the error arose and to describe individually the changes in each new claim.
 
 
 32
 Mr. Shockley filed a third declaration to comply with this requirement. This declaration asserted: "New claim 14 is identical to claim 6 as originally allowed." On May 17, 1997, the examiner issued a Notice of Allow ability for reissue claims 1 through 17. During this time, the United States Patent and Trademark Office (USPTO) revised its reissue rules under 37 C.F.R. § 1.175. The new, less stringent, Rule 1.175 became effective December 1, 1997. The '732 reissue patent issued February 17, 1998.
 
 
 33
 While Mr. Shockley's reissue patent was pending, he entered into a business agreement with Mr. Joseph O. Hawkins. Mr. Hawkins is president and shareholder of several companies, including Arcan, Telesis, and Sunex International, Inc. Mr. Hawkins' companies manufacture automotive equipment in foreign countries, then import and sell those tools in the United States. Mr. Hawkins' company Telesis had imported various products for Excalibur for about 20 years. Under the new agreement, Telesis was to find a foreign manufacturing source for the Creep-or-Seat and import this product into the United States for Excalibur.
 
 
 34
 In the fall of 1997, Telesis began importing and selling the Creep-or-Seat, manufactured at Mr. Hawkins' Sunex facility in Shanghai, to Excalibur. Mr. Hawkins requested Mr. Shockley's permission to sell some creepers to his own customers through Sunex and Arcan. Because Excalibur did not sell in Sunex's professional mechanic market, Mr. Shockley gave Mr. Hawkins an oral license to sell creepers through Sunex to four private accounts. However, because Arcan competed directly with Excalibur, Mr. Shockley refused Mr. Hawkins a license to sell creepers through Arcan.
 
 
 35
 Nonetheless, Mr. Hawkins began selling the transformable creeper under the name "Z-Creeper" through Arcan in the summer of 1997. In December 1997, Mr. Hawkins and an Arcan salesman met with representatives of Sam's to discuss potential sales of the Z-Creeper for the 1998 Father's Day and Christmas promotionals. At the meeting, Mr. Hawkins and the Arcan salesman gave Sam's a price quote of $35.95 per creeper for a potential sale of 10,000 or more creepers. In April 1998, Arcan resubmitted its proposal to Sam's for the upcoming Christmas season. Sam's began to place orders for Z-Creepers in September 1998.
 
 
 36
 Mr. Shockley and Excalibur filed an infringement suit on April 22, 1998, asserting claims 14 through 17 of the '732 reissue against Arcan, Telesis, and Sunex. On June 9, 1998, Mr. Shockley filed an ex parte request for a Certificate of Correction under 37 C.F.R. § 1.323 with the USPTO, requesting addition of the "plurality of castors" limitation to claim 14 of the '732 reissue. Mr. Shockley's request asserted that the omission of the "plurality of castors" limitation was a typographical error. This correction, Mr. Shockley noted, would make claim 14 identical to claim 6 of the '068 patent as originally allowed.
 
 
 37
 On November 12, 1998, the district court granted Mr. Shockley's partial summary judgment motion that the '732 reissue was not invalid. The district court assumed that the old, more stringent reissue Rule 1.175 applied to the '732 reissue patent. The court still found that Mr. Shockley's reissue declaration adequately specified "the excesses and insufficienc[ies] in the claims and the errors justifying the addition of reissue claims 14-17."
 
 
 38
 At trial, the jury awarded Excalibur infringement damages on 2,841 creeper sales by Telesis, and 11,403 creeper sales by Arcan. The jury further found that Excalibur lost additional sales of 40,000 creepers to Sam's for the 1998 Christmas season. The jury assessed against Arcan lost profit damages of $15 per creeper and future lost profit damages of $3,000,000 over the life of the '732 reissue patent.
 
 
 39
 The jury further found that: 1) Arcan willfully infringed; 2) Arcan did not make an offer to sell 9,180 creepers to Sam's before the '732 reissue; and 3) Arcan did in fact offer to sell 1,506 creepers to Costco before the '732 reissue. Based on these verdicts, the district court issued an order on June 11, 1999, granting Arcan intervening rights for its sales to Costco and denying both absolute and equitable intervening rights for its sales to Sam's. The district court awarded Excalibur a total of $3,791,070 in damages.
 
 
 40
 After the jury verdict, defendants made motions for JMOL on entitlement to intervening rights, on damages, and for a new trial. The district court denied all of these motions. Plaintiffs made JMOL motions on enhanced damages and requested a clarification that Arcan and Telesis were jointly liable for Arcan's infringement. The court denied both of these motions. The district court did, however, grant plaintiffs attorneys fees, costs, and prejudgment interest.
 
 
 41
 Defendants appeal the summary judgment of validity of the '732 reissue, the denial of intervening rights for Arcan's sales to Sam's, and the damages award. Plaintiffs cross appeal the district court's denial of joint and several liability. This court has jurisdiction under 28 U.S.C. § 1295(a)(1) (1994) to hear this appeal.
 
 II.
 
 42
 This court reviews the district court's grant of a motion for summary judgment without deference. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed. Cir. 1994). A summary judgment stands when the record shows no genuine issues of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c). This court also reviews the district court's interpretation of statutes and regulations, such as 35 U.S.C. § 251 and 37 C.F.R. § 1.175(a), without deference. In re Clement, 131 F.3d 1464, 1468, 45 USPQ2d 1161, 1163 (Fed. Cir. 1997). If the district court applies legal standards based on underlying findings of fact, this court sustains the district court's legal conclusions unless clearly erroneous. Id.
 
 
 43
 This court reviews the district court's JMOL rulings after a jury verdict by reapplying the district court's own standard. Applied Med. Res. Corp. v. United States Surgical Corp., 147 F.3d 1374, 1376, 47 USPQ2d 1289, 1290 (Fed. Cir. 1998). A district court may overturn a jury's verdict on a motion for JMOL only if, upon the record before the jury, reasonable persons could not reach the jury's verdict. Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed. Cir. 1984). Thus, to prevail on appeal, defendants must show that substantial evidence does not support the jury's factual findings or that the district court erred in applying the law on JMOL motions. See id.
 
 
 44
 This court reviews a jury's factual findings, such as those relevant to intervening rights, for substantial evidence. Oiness v. Walgreen Co., 88 F.3d 1025, 1029, 39 USPQ2d 1304, 1306 (Fed. Cir. 1996). This court also reviews a district court's denial of equitable intervening rights for an abuse of discretion. Westvaco Corp. v. Int'l Paper Co., 991 F.2d 735, 743, 26 USPQ2d 1353, 1360 (Fed. Cir. 1993). In addition, this court reviews a denial of a new trial based upon an alleged excessive jury damage award for an abuse of discretion. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 438-39 (1996); Oiness, 88 F.3d at 1028-29.
 
 
 45
 In reviewing district court judgments, this court applies its own law to patent law issues, but defers to regional circuit law on procedural issues. Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359, 50 USPQ2d 1672, 1675 (Fed. Cir. 1999) (en banc). The requirement of Federal Rule of Civil Procedure 50 for renewing a JMOL motion is a procedural issue. Likewise, a district court's duty to remit excessive damages is a procedural issue. This court, therefore, applies the law of the United States Court of Appeals for the Fourth Circuit for these issues in the present case.
 
 III.
 
 46
 To reissue original claims, a patentee must show that the changes will remedy errors that occurred without deceptive intent. 35 U.S.C. § 251 (1994). Section 1.175 of title 37 of the Code of Federal Regulations governs the examination of reissue applications. Old Rule 1.175 required the patentee to declare in detail the nature and origin of each error. 37 C.F.R. § 1.175(a) (1994). The new rule, effective December 1, 1997, requires the patentee to disclose only a single error for correction and to include only a general statement that the errors involved no deceptive intent. 37 C.F.R. § 1.175(a) (1997).
 
 
 47
 The USPTO examined the '732 reissue patent under old Rule 1.175. While the old rule was in effect, the USPTO issued a Notice of Allow ability and closed the reissue examination. With the old rule still in effect, Mr. Shockley paid the issue fee for the '732 reissue patent. The '732 reissue patent issued, however, two months after the new rule became effective.
 
 
 48
 In proposing changes to Rule 1.175, the USPTO informed the public that it was "particularly interested in comments as to whether the proposed rules if adopted should be applied to already pending reissue oaths or declarations under the new proposed standards of Sec. 1.175." 61 Fed. Reg. 49,819, 49,820 (Sept. 23, 1996). The few public comments addressing the effective date responded favorably to applying new Rule 1.175 to pending applications. E.g., Intellectual Prop. Owners, Comment 42 (December 5, 1996), available at http://www.uspto.gov/web/offices/ pac/dapp/opla/ comments/prop1996; Am. Intellectual Prop. Law Ass'n, Comment 2 (November 6, 1999), available at http://www.uspto.gov/web/offices/pac/dapp/opla/ comments/ prop1996. When the final rule issued, the USPTO did not explicitly state that new Rule 1.175 applied to pending reissue applications. However, the USPTO training materials for new Rule 1.175 state: "All pending reissue applications (even if filed under old rules) are only subject to requirements of new rules." USPTO, Training Book Slides on the Changes to Patent Practice and Procedure - Final Rule, p. 48 (February 12, 1998), available at http://www.uspto.gov/web/offices/pac/dapp/opla/frule/ index.html.
 
 
 49
 Indeed, an effective date, unless expressly conditioned on other events, governs the application of a new rule. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). This court declines to alter on a case-by-case basis the governing effective date of this administrative rule. Because the application which led to the '732 reissue patent was pending when the new rule took effect, the new rule applies in this case.
 
 
 50
 Molins PLC v. Textron, Inc., 48 F.3d 1172, 1179 n.8, 33 USPQ2d 1823, 1827 n.8 (Fed. Cir. 1996) does not require application of the old rule in this case. In Molins, the patent in question had issued before the effective date of a rule change. Therefore, this court properly applied the rule used to evaluate the patent because that same rule remained in effect at the time of issuance. See Bowen, 488 U.S. at 208 ("[A]dministrative rules will not be construed to have retroactive effect unless their language requires this result."). In the present case, this court, as in Molins, declines to apply a rule change retroactively, but rather applies the rule in effect upon the date of issuance of the patent.
 
 
 51
 Defendants' questions regarding the validity of the '732 reissue rely exclusively on application of old Rule 1.175 to the '732 reissue patent. Defendants raise no questions about validity of the '732 reissue patent under new Rule 1.175. The reissue declaration for the '732 patent fully complies with new Rule 1.175. The declaration identifies several errors and includes statements of lack of deceptive intent for each error.
 
 
 52
 Likewise, defendant's arguments regarding the ineffectiveness of Mr. Shockley's Certificate of Correction to add the "plurality of castors" limitation to the '732 reissue patent are moot under new Rule 1.175. Even in the unlikely event that this court determined that a Certificate of Correction would not suffice to add the "plurality of castors" limitation to the '732 reissue, the resulting broader claim 14 would still be valid under the less restrictive declaration requirements of new Rule 1.175. This court, therefore, affirms the district court's grant of summary judgment that the '732 reissue patent is not invalid for failure to comply with 37 C.F.R. § 1.175.
 
 IV.
 
 53
 The second paragraph of 35 U.S.C. § 252 (1994) provides for two separate and distinct defenses to patent infringement under the doctrine of intervening rights: "absolute" intervening rights and "equitable" intervening rights. BIC Leisure Prods., Inc., v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1220, 27 USPQ2d 1671, 1675 (Fed. Cir. 1993). The first sentence of the paragraph defines absolute intervening rights.
 
 
 54
 A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.
 
 
 55
 35 U.S.C. § 252 (emphasis added).
 
 
 56
 The "offered to sell" language became part of § 252 in 1994 as one of several changes made to bring title 35 of the United States Code into compliance with the General Agreement on Tariffs and Trade. Before addition of the "offered to sell" language, this court's case law under § 252 permitted an accused infringer to continue to use or sell a product that was already made by the issue date of a reissued patent. BIC Leisure, 1 F.3d at 1221; P. J. Federico, Intervening Rights in Patent Reissues, 30 Geo. Wash. L. Rev. 603, 632 (1961-62). Absent a clear showing, this court will not assume that the 1994 amendments changed this aspect of § 252.
 
 
 57
 Section 252 states that a reissue patent "shall not abridge the right of any person who . . . offered to sell . . . anything patented by the reissued patent, to continue to . . . offer to sell . . . the specific thing . . . offered for sale" (emphasis added). These rights are absolute. BIC Leisure 1 F.3d at 1221. The statute uses the term "the specific thing" to refer to the tangible article which qualifies for absolute intervening rights. This "specific thing" terminology suggests that the tangible article was in existence before the reissue date.
 
 
 58
 By comparison, the equitable intervening rights provisions of § 252 state:
 
 
 59
 The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.
 
 
 60
 35 U.S.C. § 252 (emphasis added). This equitable intervening rights language uses the broader term "the thing" to refer to the subject merchandise. Equitable intervening rights also explicitly extend protections for continued manufacture, thus extending protection to articles not yet in existence at the time of the reissue. The use of "specific thing" in the absolute intervening rights section thus underscores a distinction in the status of the article at the time of reissue. Specifically, a "specific thing" qualifies for absolute intervening rights only if in existence at the time of reissue. BIC Leisure, 1 F.3d at 1221 ("The specific things made before the date of reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of reissue without regard to the patent."). Thus, after the 1994 amendments, § 252 continues to distinguish between "specific things" and "things," between the status of articles subject to absolute or equitable intervening rights.
 
 
 61
 Arcan asserts that its December 1997 negotiation with Sam's resulted in an offer for sale qualifying for absolute intervening rights under § 252. Arcan further argues that an offer for sale should encompass price quote letters that contain a description of the infringing materials without regard to whether those offers covered products already manufactured. See 3D Sys., Inc. v. Aarotech Lab., Inc., 160 F.3d 1373, 1378-79, 48 USPQ2d 1773, 1777 (Fed. Cir. 1998) (defining "offer to sell" under 35 U.S.C. § 271). However, regardless of whether Arcan's December 1997 price quote was an offer for sale to Sam's, the 10,000 Z-Creepers at issue had not been manufactured before the '732 reissuance. Absolute intervening rights therefore do not protect Arcan's importation and sale of its Z-Creepers. The district court correctly determined that importation and sale of these articles constitutes infringement.
 
 
 62
 Under the equitable intervening rights of § 252, a district court has discretion to grant broader rights for an accused infringer to: (1) continue the manufacture, use, offer for sale, and sale of additional articles made before the reissue; and (2) continue to manufacture, use, offer to sell, or sell articles for which substantial preparations for manufacture or use was made before the grant of the reissue. BIC Leisure, 1 F.3d at 1221. Arcan charges the district court with error for not making findings about whether Arcan had made substantial preparations before the reissue date.
 
 
 63
 Although the district court did not make findings about Arcan's preparations, the record amply supports the district court's denial of equitable intervening rights. The jury found that Arcan's infringement of the '732 reissue was willful. Because Arcan did not have clean hands, the district court did not abuse its discretion in declining to exercise its equitable powers on Arcan's behalf. Equity's "unclean hands" doctrine demands that "[one] who seeks equity must do equity." Mfr.'s Fin. Co. v. McKey, 294 U.S. 442, 449 (1935). The record, with its finding of willful infringement, amply supports the district court's discretion to deny Arcan access to equity.
 
 V.
 
 64
 Under the Federal Rules of Civil Procedure, a party may make a Rule 50(b) renewed motion for JMOL after a jury verdict only if the party made a motion for JMOL at the close of evidence under Rule 50(a). Price v. City of Charlotte, 93 F.3d 1241, 1248-49 (4th Cir. 1996); Fed. Sav. & Loan Ins. Co. v. Reeves, 816 F.2d 130, 137 (4th Cir. 1987). Arcan did not make a Rule 50(a) motion before jury deliberation. Therefore, the district court correctly denied Arcan's post-verdict Rule 50(b) motion.
 
 
 65
 The Fourth Circuit, in a rarely utilized exception, allows a party to make a Rule 50(b) motion despite failure to file a Rule 50(a) motion where: (1) the basis for the Rule 50(b) motion is a purely legal issue; and (2) the opposing party had notice of the defect and an opportunity to correct the error. Singer v. Dungan, 45 F.3d 823, 829 (4th Cir. 1995); Federal Savings, 816 F.2d at 138. In Federal Savings, the Fourth Circuit reached the purely legal issue of whether a civil cause of action arises from a federal criminal statute even though the defendant did not raise the issue in a Rule 50(a) motion. 816 F.2d at 137. The present case's issue of damages, often a very factual inquiry, is not a purely legal issue to which the Fourth Circuit exception applies.
 
 
 66
 In Singer, the Fourth Circuit did reach a factual issue even though the defendant did not move for JMOL at the close of all evidence. 45 F.3d at 829. The defendant in Singer, however, moved for JMOL under Rule 50(a) at the close of plaintiff's case in chief. Furthermore, the Fourth Circuit found no evidence in support of the factual question at issue. Balancing the equities of the specific circumstances in Singer, the Fourth Circuit decided to reach defendant's Rule 50(b) motion. In the present case, defendants did not make any Rule 50(a) motion during trial. Furthermore, plaintiffs presented expert testimony in support of their future lost profits request. Arcan's argument that this evidence is legally insufficient does not equate plaintiffs' expert's testimony to the absence of supportive evidence in the Singer case. Therefore, Singer also does not rescue Arcan from its failure to properly follow Rule 50.
 
 
 67
 Although the district court correctly denied Arcan's Rule 50(b) motion on damages, this court follows Fourth Circuit law in determining that the jury's damage award is excessive and must be remitted. Under Fourth Circuit law, "[t]he power and duty of the trial judge to set aside [an excessive] verdict . . . is well-established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right." Virginian Ry. Co. v. Armentrout, 166 F.2d 400, 408 (4th Cir. 1948) (citations omitted). The Fourth Circuit, relying on Supreme Court precedent, has extended this obligation to the appellate level. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 304 (4th Cir. 1998) (citing Gasperini, 518 U.S. 415 ). Because the excessiveness of jury damages verdicts is a question of law in the Fourth Circuit, Fourth Circuit law permits orders of a new trial nisi remittitur by an appellate court. Id. at 305; see also Charles Alan Wright et al., 11 Federal Practice and Procedure, Civil 2d § 2820 (1995).
 
 
 68
 This court, like the Fourth Circuit, has a "maximum recovery rule" which remits an excessive jury award to the highest amount the jury could "properly have awarded based on the relevant evidence." Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 519, 36 USPQ2d 1540, 1544 (Fed. Cir. 1995). This court then allows a plaintiff the option of a new trial on damages or the remitted damages award. Oiness, 88 F.3d at 1030. Further according to both Fourth Circuit law and the law of this court, a damages verdict must be set aside if the verdict is against "the clear or great weight of the evidence." Unisplay, 69 F.3d at 517; Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir. 1941).
 
 
 69
 In the present case, defendants requested remittitur of damages and a new trial under Federal Rule of Civil Procedure 59. Despite defendants' Rule 50(b) oversight, a request for remittitur in combination with a Rule 59 motion for a new trial is equivalent to a request for a new trial nisi remittitur. Because the future lost profit jury verdict was grossly excessive, the district court abused its discretion in not offering plaintiffs a remitted damages amount or a new trial in the alternative.
 
 
 70
 Upon a finding of infringement, title 35 permits an award of damages adequate to compensate the patentee for infringement, but in no event less than a reasonable royalty. 35 U.S.C. § 284 (1994). To recover lost profits, "a patent owner must prove a causal relation between the infringement and its loss of profits." BIC Leisure, 1 F.3d at 1218. In other words, the burden rests on the patentee to show a reasonable probability that "but for" the infringing activity, the patentee would have made the infringer's sales. Water Tech. Corp. v. Calco Ltd., 850 F.2d 660, 671, 7 USPQ2d 1097, 1106 (Fed. Cir. 1988). To show causation and entitlement to lost profits, a patentee must reconstruct the market to show "likely outcomes with infringement factored out of the economic picture." Grain Processing Corp. v. Am. Maize-Prods., 185 F.3d 1341, 1350, 51 USPQ2d 1556, 1562 (Fed. Cir. 1999). Such market reconstruction, though hypothetical, requires "sound economic proof of the nature of the market." Id.
 
 
 71
 This court acknowledges that a patentee may be able to produce sufficient evidence to recover projected future losses. In fact, this court has affirmed future lost profit awards where the patentee has presented reliable economic evidence of "but for" causation. Although future lost profit calculations necessarily contain some speculative elements, a patentee may supply adequate evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork. Oiness, 88 F.3d at 1031.
 
 
 72
 For example, in Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1068, 219 USPQ 670, 678 (Fed. Cir. 1983), this court affirmed a district court award of projected lost profits, finding that in a two supplier market, "an award based on projected lost sales is neither remote nor speculative when there is evidence of actual pre-infringement and post-infringement growth rates . . . . These damages were not picked out by mere speculation or guess, but rather, found by the district court as the result of an extrapolation of actual data."
 
 
 73
 In Oiness, however, this court rejected extrapolated lost profit calculations when the damages rested on unsupported assumptions "fraught with speculation." Oiness, 88 F.3d at 1029-30. Oiness' expert testified to an extrapolated demand curve for the patentee's product based on figures from the product's first few months in the marketplace. The expert admitted that he found very little sales history to support his projection. This court held that Oiness' expert "offered no sound economic reasoning to support his assumption," that his "projections lacked evidentiary support" and that the record, therefore, did not support the jury's future lost profit award. Id. at 1032. Similarly, in the present case, the jury award of future lost profits assumes continued demand and growth rates, profit margins, and other market factors against the clear weight of the evidence.
 
 
 74
 To establish future lost profits, plaintiffs put forth the testimony of an accounting expert, Mr. Gordon. Mr. Gordon's calculation assumed that, without infringement, "Excalibur would [have sold] eighty thousand [creepers to Sam's] per year for the next fifteen years throughout the life of the patent." Mr. Gordon then multiplied the eighty thousand creepers per year by fifteen years to arrive at 2,200,000 lost future sales to Sam's. Mr. Gordon further assumed that the profit for each lost sale would remain at $15 over the entire fifteen year period. He multiplied this assumed profit per creeper by the number of assumed lost creeper sales to arrive at an $18,000,000 future lost profits calculation.[1]
 
 
 75
 Mr. Gordon next discounted the projected $18,000,000 to present value taking into account "risks involved" such as the possibility that "Sam's may cancel the contract," that Mr. Shockley might not "want to be in this business any more," and that "we might have a war or tax laws might change." His discount rate was twenty-five percent, resulting in an estimated future lost profit total of about four and a half million dollars.
 
 
 76
 Mr. Gordon further testified that his determination that Excalibur would have sold 80,000 units per year to Sam's was an assumption without factual underpinnings. Rather, Mr. Gordon testified that he based his opinion on the number of sales that Excalibur told him to assume it would have made. Thus, Mr. Gordon used a benchmark without any basis in economic reality.
 
 
 77
 Plaintiffs further put forth the testimony of Excalibur's salesperson, Mr. Tuck. He testified that Excalibur had been trying to sell various products to Sam's, including the Creep-or-Seat, since the mid-1990s with no success. Mr. Shockley's own testimony corroborated that Excalibur had not sold any articles to Sam's despite many attempts. Mr. Tuck also testified that Excalibur was unable to sell to Sam's in 1998 "because the buyer quit . . . . Ruined the whole deal." Mr. Tuck's and Mr. Shockley's testimony cast significant doubts on Excalibur's ability to make 80,000 sales per year to Sam's as postulated by Mr. Gordon. Because the jury's $3,000,000 future lost profit award was based on evidence derived from speculative assumptions, it runs counter to the great weight of record evidence and cannot stand.
 
 
 78
 Arcan has explicitly declined to challenge the $600,000 in lost profits the district court awarded Excalibur for Sam's 1998 Christmas season. Defendants further do not question the $191,070 in lost profits awarded to Excalibur for defendants' actual infringing sales. Thus, in keeping with Fourth Circuit Law, this court vacates the speculative damage award, remits the $3,791,070 award to $791,070, and remands to the district court to offer plaintiffs the option of the remitted damages award or a new damages trial.
 
 VI.
 
 79
 Telesis and Sunex argue that joint and several liability does not apply in the present case. They vigorously contend that the verdict form explicitly apportioned damages among the three defendants; that the jury explicitly found that Sunex did not infringe the '732 reissue; and that the jury found Telesis accountable for 2,841 creepers not sold to Arcan or Excalibur.
 
 
 80
 Notwithstanding these arguments, both Telesis and Sunex sold creepers to purchasers other than Arcan. The apportioned damages, and jury findings of non-infringement by Sunex and separate infringement by Telesis apply to Sunex's and Telesis' sales other than their creeper sales to Arcan. Thus, the damages apportionment and jury findings do not preclude joint and several liability for Arcan's liability.
 
 
 81
 Furthermore, other courts, including the Supreme Court, have held that parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale. Birdsell v. Shaliol, 112 U.S. 485, 488-89 (1884); Dowagiac Mfg. Co. v. Deere & Webber Co., 284 F. 331, 337 (8th Cir. 1922). Each joint tort-feasor is liable for the full amount of damages (up to a full single recovery) suffered by the patentee. Birdsell at 488-89; Dowagiac at 337. Entry of judgment against one infringer does not automatically release other related infringers. Sherman, Clay & Co. v. Searchlight Horn Co., 225 F. 497, 500 (9th Cir. 1915) ("There may be as many causes of action as there are joint tort- feasors, and as many recoveries, but there can only be one satisfaction."). This court agrees with and adopts this rule.
 
 
 82
 In the present case, the record shows that Sunex, Telesis, and Arcan benefitted from a manufacturing, supply and distribution relationship. Each infringing Z-Creeper made by Sunex was imported by Telesis into the United States and resold to Arcan. Telesis, therefore, is a joint tort-feasor and is jointly and severally liable for damages assessed against Arcan.
 
 
 83
 Sunex, however, cannot be held jointly and severally liable. To be liable for infringement under 35 U.S.C. § 271, a party must make, use, offer to sell, or sell within the United States, or import into the United States, the patented invention. Although Sunex manufactured every Z-Creeper that Arcan sold in the United States, all of Sunex's activities took place in Shanghai. Sunex, therefore, cannot be liable for infringement under § 271 nor be jointly liable with Arcan and Telesis.
 
 CONCLUSION
 
 84
 This court affirms the district court's grant of summary judgment that the '732 reissue patent is not invalid. This court also affirms the district court's denial of both absolute and equitable intervening rights to Arcan. This court vacates the district court's judgment awarding damages to plaintiffs, remits the damages award to $791,070, and remands to the district court to offer plaintiffs a choice of the remitted damage award or a new damages trial in the alternative. Finally, this court reverses the district court's denial of plaintiffs' motion to clarify, and remands to the district court to clarify its judgment to hold that Telesis is jointly and severally liable with Arcan.
 
 COSTS
 
 85
 Each party shall bear its own costs.
 
 
 86
 AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, and REMANDED
 
 
 
 Notes:
 
 
 [1]
 This court realizes that 2,200,000 multiplied by $15 results in $33,000,000, not the $18,000,000 testified to by Mr. Gordon. Because neither party challenges Mr. Gordon's calculation, this court will discuss Mr. Gordon's future lost profits calculation.