Andrea SMITH, Personal Representative of the Estate of Kelly Snider Smith, Plaintiff,

v.

BOTSFORD GENERAL HOSPITAL, Defendant.

No. 00–71459.

United States District Court, E.D. Michigan, Southern Division.

March 8, 2004.

---

Geoffrey N. Fieger, Fieger, Fieger, Jody Lipton, Marc E. Lipton, Lipton Law Center, Southfield, MI, for Plaintiff.

Ernest R. Bazzana, Plunkett & Cooney (Mount Clemens), Mount Clemens, MI, Jeffrey Feikens, Linda M. Galbraith, Feikens, Stevens, Detroit, MI, Robert G. Kamenec, Bloomfield Hills, MI, Steven B. Galbraith, Galbraith & Booms, Southfield, MI, for Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR REMITTITUR AND/OR NEW TRIAL

COHN, District Judge.

### I.

#### A.

This is an action under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (EMTALA), tried to a jury under Michigan's Wrongful Death Act, M.C.L. § 600.2922. Plaintiff Andrea Smith (Smith), the Executor of the Estate of Kelly Snider Smith, claims that defendant Botsford General Hospital (Botsford) transferred Kelly Smith to the University of Michigan Medical Center before stabilizing his medical condition, in violation of EMTALA.

At the conclusion of fifteen days of trial in April 2003, the jury agreed with Smith and returned a verdict for thirty-five thousand dollars ($35,000.00) in economic damages and five million dollars ($5,000,000.00) in non-economic damages for the pain and suffering to Kelly Smith and for the loss of love an companionship to his next of kin; now deceased father and grandmother and surviving sister and grandmother. The background and issues of the case are described in the Decision on Order Denying Defendant's Motion to Alter or Amend the Judgment, entered February 9, 2004, the Decision on Order Denying Defendant's Motion for Judgment as a Matter of Law, entered February 11, 2004, and the Memorandum on Order Denying Motion for New Trial, entered February 17, 2004, and will not be repeated here.

Now before the Court is Botsford's Motion For Remittitur and/or New Trial on the grounds that

> [t]he lump sum award of Five Million ($5,000,000.00) Dollars to be paid without any reduction to present value for an undifferentiated a loss of society and companionship and conscience pain and suffering as a result of the death of a 33 year old, unmarried male survived only by his now deceased father and grandmother, sister and grandmother is beyond the range supported by the proofs and, alternatively, so excessive as it should shock the conscience.

### B.

Consideration of the motion first requires a decision on whether or not the $5,000,000.00 award for non-economic damages is so excessive as to require a new trial. Second, the Court must decide whether or not the excessive portion can be eliminated by a remittitur. Third, it requires a decision on the amount of the excessiveness if a remittitur is in order. Given this open-ended and indeterminate standard for an award of non-economic loss (conscious pain and suffering coupled with loss of society and companionship), this decision does not come easy, as commentators have recognized. *See e.g.* Randall R. Bovbjerg, Frank A. Sloan, James F. Blumstein, *Valuing Life and Limb in Tort: Scheduling "Pain and Suffering"*, 83 Nw. U.L.Rev. 908 (Summer 1989).

While the precedents say the Court is not to substitute its judgment for that of the jury, inevitably a good deal of subjective decision-making is involved; there are simply no bright lines to which to look. That said, for the reasons which follow, the motion is DENIED.

### II.

The parties agree that Michigan law on remittitur applies; the parties disagree on the standards to be applied. While there may be some verbal differences between the way the standards are expressed in the Michigan precedents and the way they are expressed in Sixth Circuit precedents, the Court prefers to look to the federal standard. What it said in *Edwards v. Flagstar Bank*, 109 F.Supp.2d 691 (E.D.Mich.2000) is appropriate to its decision on Botsford's motion. There the Court said:

> Wright and Miller is also instructive as to the size of a verdict, stating as follows:
>
> > A motion under Rule 59 is an appropriate means to challenge the size of the verdict. The Court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not to limit the Court's power. It may also grant a new trial if the size of the verdict is against the weight of the evidence.
> >
> > This is merely a special application of the general power of the trial court to set aside a verdict that is against the weight of the evidence, and the general principles developed in the preceding section are applicable to a motion on this ground. The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages, but it may do so if the proceedings have been tainted by appeals to prejudice or if the verdict in the light of the evidence is so unreasonable that it would be unconscionable to permit it to stand. The phrase "shocks the conscious of the court," among others, is much used in the cases but adds very little by way of guidance. The power exists from the trial judge whether the verdict is unreasonably high or unreasonably low.
> >
> > There is a difference, however, that must be noted. If the Court finds

that the verdict is unreasonably high, it may condition denial of a motion for a new trial on plaintiff's consent to a remittitur. If the verdict is too low, it may not provide for an additur as an alternative to a new trial.

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2807 (2d ed.1995).

### 3. Remittitur

In *Strickland v. Owens Corning,* 142 F.3d 353 (6th Cir.1998), the Sixth Circuit set forth the following standard for remittitur:

> A motion for new trial seeking a remittitur of a jury's verdict ... should be granted only if the award clearly exceeds the amounts which, under the evidence in the case, was the maximum that a jury could reasonably find,

> *Id.* at 357 (citing *Roush v. KFC Nat'l. Management Co.,* 10 F.3d 392, 397 (6th Cir.1993) (citations and internal quotation marks omitted)).

In addition, in *Farber v. Massillon Board of Education,* 917 F.2d 1391 (6th Cir.1990), the Sixth Circuit stated:

> As a general rule, this Court has held that "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss".

> "A trial court is within its discretion when remitting a verdict only when after reviewing all of the evidence in a light most favorable to the awardee it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice, or so excessive or inadequate as to shock the conscience of the Court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court may not substitute its judgment

or credibility determinations for those of the jury. Moreover, it abuses its discretion in ordering either remittitur or new trial when the amount of the verdict turns upon conflicting evidence and the credibility of witnesses."

*Id.* at 1395 (citations omitted). The Sixth Circuit also made clear that a remittitur, when appropriate, must offer a new trial as an alternative: "Moreover, even if remittitur had been appropriate here, a forced remittitur without the offer of the option of a new trial on the issue of damages constitutes error, requiring this court to reverse and reinstate the verdict."

*Id.* at 1396.

### 4. Determination of Excessiveness

As to the determination of excessiveness, the court in *Darby v. Heather Ridge,* 827 F.Supp. 1296 (E.D.Mich. 1993), a housing discrimination case, said:

> One factor to be considered in determining whether to set aside an award of damages is whether the award is out of line with awards in similar cases. The court is fully aware that "the assessment of damages, especially for intangible harms, such as humiliation and distress, is inescapably judgmental and subjective to a large degree, and to that degree therefore discretionary." The Court is also mindful of the Sixth Circuit's admonition to appellate courts that they "should not attempt to reconcile widely varied past awards for analogous injuries 'which in the abbreviated appellate decisions of them seem somewhat similar.' "

*Id.* at 1299–1300 (internal citations omitted).

109 F.Supp.2d at 695–96.

Also instructive is what the Sixth Circuit said in *Slayton v. Ohio Dept. of Youth Serv.,* 206 F.3d 669, 679–80 (6th Cir.2000):

> Even if one might consider the award generous, *see Koster v. Trans World Airlines, Inc.,* 181 F.3d 24, 34 (1st Cir. 1999) (holding that remittitur is not appropriate because the award is *"extremely generous,"* but is only allowed when the award is "grossly disproportionate" to adduced evidence), DYS has not demonstrated that the award and underlying facts are so incongruous to shock the conscience, fall outside the bounds supportable by proof, or suggest mistake. Accordingly, we hold that the district court did not abuse its discretion in denying DYS' remittitur motion.

(emphasis added).

### III.

### A.

Kelly Smith was at Botsford for approximately three hours. After about an hour, the decision was made to transfer him to University Hospital in Ann Arbor. It took another two hours to implement the decision until he left Botsford. Kelly Smith was in the ambulance for about forty minutes before he lost consciousness. He was pronounced dead about an hour later. Therefore, once the decision to transfer was made, he suffered "pain and suffering, mental anguish, fright, shock, embarrassment, humiliation and mortification" for at approximately two hours and forty minutes.

The persons who suffered compensable "loss of society and companionship, etc." were: Rosa Smith, his paternal grandmother, who died on January 16, 2003, Willie Smith, his father, who died on October 24, 2001, Constance Snider, his maternal grandmother, and Andrea Smith, his sister with whom he lived. Rosa Smith and Andrea Smith testified at trial; Willie Smith testified by deposition. None of them were cross-examined as to their suffering. The testimony of these witnesses could lead the jury to conclude that the family was very close and Kelly Smith's death caused them great sorrow.

Because both Willie Smith and Rosa Smith survived Kelly Smith but died before trial, the period in which they lost the "love, society and companionship, etc." was rather short. Constance Snider and Andrea Smith, on the other hand, survived Kelly Smith and did and will continue to suffer a loss of society and companionship from the death of Willie Smith. Their ages and relationships to Kelly Smith were known to the jury as was Willie Smith's age and life expectancy.

### B.

The jury was instructed as follows:

> ... non economic damages include: One, reasonable compensation for the pain and suffering, mental anguish, fright and shock, embarrassment, humiliation and mortification undergone by Kelly Snider Smith while he was conscious during the time between his injury and his death as a direct result of the conduct of the hospital; two, losses suffered by Andrea Smith, Willie Smith, Constance Snider and Rosa Smith as a result of Kelly Snider Smith's death, including loss of love, society and companionship, loss of fights or other valuable gratuities, loss of services, loss of guidance and advice.
>
> •    •    •    •    •
>
> The amount of money to be awarded for certain of these elements of damage cannot be awarded for certain of these elements of damage cannot be proved into precise dollar amounts.

The law leaves such amounts to your sound judgment. Your verdict must be solely to compensate the estate and not to punish the hospital.

This instruction is consistent with Michigan's wrongful death instruction on damages which reads:

If you decide the plaintiff is entitled to damages, you shall give such amount as you decide to be fair and just, under all the circumstances, those persons represented in this case. Such damages may include the following items, to the extent you find they have been proved by the evidence:

.     .     .     .     .

3. Losses suffered by [name of surviving spouse/name of next of kin] as a result of [name of decedent's] death, including

   a.   loss of financial support

   b.   loss of service

   c.   loss of gifts or other valuable gratuities

.     .     .     .     .

   e.   loss of society and companionship

.     .     .     .     .

Which, if any, of these elements of damage has been proved is for you to decide, based upon evidence and not upon speculation, guess, or conjecture. The amount of money damages to be awarded for certain of these elements of damages cannot be proved in a precise dollar amount. The law leaves such amount to your sound judgment. Your verdict must be solely to compensate for the damages and not to punish the defendant.

Mich. Civ. Jury Instruction 45:02.

Botsford did not object to the instruction, but did request that the jury also be instructed as to life expectancy of Kelly Smith and his survivors. Botsford also requested an instruction to discount damages to present value. The Court declined to give such instructions; the present value instruction was also the subject of a post-trial motion.

Notably, Michigan's wrongful death instruction does not require the jury to separate its verdict on pain and suffering and loss of society and companionship.

### C.

In final argument, Botsford's counsel suggested that if there was liability the non-economic damages were no more than 2, 3, 4 or 5 times the economic damages, or a maximum of $175,000.000 ($35,000.000 × 5). Botsford's counsel, in common parlance, low-balled the amount. Botsford's counsel made no mention of Kelly Smith's conscious pain and suffering at the hospital or in the ambulance and no mention of the family relationships. Rather, throughout the trial Botsford's counsel focused solely on the liability issues to the exclusion of any meaningful consideration of the possibility it would be found liable. As a consequence, it paid little attention to the damages issue.

On the other hand, Smith's counsel in final argument suggested 10 million dollars for pain and suffering and 10 million for loss of society and companionship. Neither figure had aura of authenticity about it; Smith's counsel clearly exaggerated.

In the end, the jury increased Botsford's suggested damage amount by $4,825,000.00 and reduced Smith's suggested damage amount by $15 million dollars.

Considering the evidence relating to pain and suffering and loss of society and companionship with the final argument and then juxtaposing this with the jury instructions, the jury was left pretty much at sea in coming to a unanimous decision on a dollar amount for non-economic damages. This observation is not meant to be a criticism of the manner in which the issue of damages was dealt; it simply reflects the fact that the jury had very little

guidance as to an appropriate amount of non-economic damages.

## IV.

### A.

■ The principle factor to be considered in determining excessiveness is whether or not the award is out of line with similar cases.[1] This consideration, however, is not without its limitations. Clearly, there will rarely, if ever, be a case that is factually on all fours; the best that can be done is look to analogous cases where the excessiveness of the award has been at issue. In this case, the Court must to look to wrongful death actions which involved consciousness pain and suffering, survivors, and where excessiveness was an issue. As will be discussed, the Court looked to these type of cases in reaching its decision.

■ The Court is also mindful that it may not substitute its judgment for that of the jury. In other words, it cannot make its decision on the basis simply of what it would have awarded, even if it disagrees with the jury's verdict. Beyond considering analogous cases, an apparent objective criteria, there is still an absence of standards by which to determine excessiveness.[2]

### B.

■ The amount of the verdict did not turn upon conflicting evidence or the credibility of witnesses. The principal factors which went into the jury's consideration was the pain and suffering suffered by Kelly Smith either from the time he arrived at Botsford (the time in the instructions) or from the time the decision was made to transfer him (when EMTALA's requirements came into play) to the time he lost consciousness and the time of his death, plus the loss suffered by his family, principally his sister and surviving grandmother, as a consequence of his death.

## V.

### A.

Each party has proffered a number of cases, trial and appellate, which are said to

1. While Botsford argues that the Court should also consider the improper conduct and argument of Smith's counsel, this argument was already been decided against it in the Decision on Order Denying Defendant's Motion for a New Trial. Likewise, Botsford's argument that passion affected the jury's verdict, has already been decided against it. It is also worthy of note that Botsford, while arguing for a remittitur, offers no yardstick by which the amount of the remittitur is to be measured.

2. The Court is not alone in its thinking as to the lack of clear standards in determining excessiveness. As Justice Stephen Markman said at the oral argument in *Gilbert v. DaimlerChrysler*, 2002 WL 1767672 (Mich.App. July 30, 2002), *leave granted*, 661 N.W.2d 232 (Mich. Apr.8, 2003) (Table, No. 122457), a sexual harassment case where the jury awarded the plaintiff 21 million dollars:

    I'd like to focus on what you've described as the grossly excessive verdict. And I looked at the briefs closely and I guess I find a real absence of any standards there by which we can determine what is a grossly excessive verdict and I guess my question to you is, is this merely going to become one of those areas of the law in which we know it when we see it, in which there is some vague subjective amorphous thoughts that this seems too high or this seems inadequate. Are there any standards here. What did the court do wrong in dealing with the remittitur issue. Why was there an abuse of discretion. When do we know that we've got it right. It may seem high to me but are there any other standards beyond the fact that it kind of seem to be high or it seems to be low. And comparing it to other cases doesn't necessarily answer the question, it seems to me. That presumes that those other cases are decided correctly and they may be based upon some first case and who knows if there first case was based upon proper considerations or not.

be sufficiently analogous to be benchmarks for assessing the verdict in this case. Initially Botsford proffered cases in which the verdicts (one case was a settlement) ranged from $1,650,000.00 to $16,000.00 All of these cases were from Michigan circuit courts and none discussed excessiveness or remittitur. Smith responded with 16 cases ranging in verdicts from $14,000,000.00 to $850,000.00 and again none of the text provided discussed excessiveness or remittitur. All appeared to be trial court decisions and only one was a Michigan circuit court case. None of these cases were of any assistance.

Subsequently, at the Court's request, the parties each developed a matrix of what they considered analogous cases. Smith's matrix displayed 30 or more cases while Botsford's matrix displays seven cases. Again, the facts of each of the cases appear to vary widely as did the verdict amounts; and again, none of the cases discussed excessiveness or remittitur.

Smith then followed-up with two additional cases, both from the Michigan Court of Appeals. *May v. City of Detroit*, 2003 WL 21362985 (June 12, 2003) (unpublished) and *Meek v. Dept. of Transp.*, 240 Mich.App. 105, 610 N.W.2d 250 (2000). These cases will be discussed below.

### B.

Finding the conflicting decisions proffered by Smith and Botsford of little assistance, the Court, at a hearing on January 23, 2004, directed the parties to each given the Court two to three factually similar cases consistent with the "maximum recovery rule" which has been described as follows:

> "[W]e apply the loosely defined 'maximum recovery rule' when deciding whether a remittitur is in order. This judge-made rule essentially provides that we will decline to reduce damages

where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Douglass*, 897 F.2d at 1344 (emphasis in original). The rule applies regardless of whether the award was made by a jury. *Id.* at 1337, 1339 n. 3, 1344. The rule "does not necessarily limit an award to the highest amount previously recognized in the state;" indeed, the rule "does not become operative unless the award exceeds 133% of the highest previous recovery in the [relevant jurisdiction]" for a factually similar case. *Id.* at 1344 n. 14. Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited "if unique facts are present that are not reflected within the controlling caselaw." *Id.* at 1339.

*Lebron v. United States*, 279 F.3d 321, 326 (5th Cir.2002) (internal footnote omitted).

In addition to *Lebron, supra*, a good discussion of the rule can be found in the following cases: *Gorsalitz v. Olin Mathieson*, 429 F.2d 1033 (5th Cir.1970); *Glazer v. Glazer*, 278 F.Supp. 476 (E.D.La.1968). The Federal Circuit, First Circuit, Fifth Circuit and Seventh Circuit have also employed the maximum recovery rule in reviewing damages awards. *See e.g. Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed.Cir.2001); *Koster v. Trans World Airlines*, 181 F.3d 24, 36 (1st Cir.1999); *Spesco, Inc. v. General Elec. Co.*, 719 F.2d 233, 240–41 (7th Cir.1983).

On reflection, what the "maximum recovery rule" calls for is little more that what both the Michigan and federal rules on excessiveness call for, except for the 133% ceiling. However, the cases then proffered by the parties did offer insight into the task the Court faced in deciding whether a remittitur is in order.

## C.

### 1.

Botsford proffered two cases: *Crystal v. Hubbard,* 414 Mich. 297, 324 N.W.2d 869 (1982) and *Davis v. City of Detroit,* 149 Mich.App. 249, 386 N.W.2d 169 (1986). *Crystal* involved a wrongful death action arising out of an automobile accident. The issue was who was entitled to claim damages for loss of society and companionship. Liability was conceded. The trial judge allowed a claim by the decedent's siblings. The aggregate in damages to the survivors was $68,000.00 The Michigan Supreme Court held that the siblings could not recover; it said nothing about the award.

*Davis* involved a jail suicide and related solely to the scope of the coverage of the wrongful death statute. The jury awarded $190,000.00 in non-economic damages to a surviving wife. The Michigan Court of Appeals found the award "not unreasonable" and not a "shock [to] the judicial conscience." 149 Mich.App. at 267, 386 N.W.2d 169. Putting aside the age, these cases are of no help. At most, they demonstrate that juries, like judges, do differ.

### 2.

Smith proffered five cases. These cases are instructive with the exception of *Swans v. City of Lansing,* 65 F.Supp.2d 625 (W.D.Mich.1998), a jail death as the result of jailer brutality which resulted in a $9,800,000.00 award of damages for conscious pain and suffering and for loss of love and affection by five adult and five young children.[3]

In *Phillips v. Mazda Motor,* 204 Mich. App. 401, 516 N.W.2d 502 (1994), a wrongful death action involving a son who was killed during the construction of a factory, a $3,300,000.00 jury verdict was held not to

be excessive. The Court of Appeals explained:

Although the jury's award of $3,300,000 was a substantial sum, it was not greater than the highest amount of damages supported by the evidence. Decedent was only twenty-two years old, in good health, and gainfully employed in a skilled trade. His death was slow and undoubtedly painful. He was pinned and nearly severed by a seven-ton steel truss. His legs were crushed like an accordion. Yet, he remained conscious for about thirty minutes while trapped under the weight of the truss. Given these facts, we cannot say that remittitur was mandatory.

204 Mich.App. at 416–17, 516 N.W.2d 502.

In *Klinke v. Mitsubishi Motors Corp.,* 219 Mich.App. 500, 556 N.W.2d 528 (1996), the decedent, a 22 year old single woman survived by her mother, father, and sister, was killed in one vehicle rollover accident. There was a short period of conscious pain and suffering. A $5,104,000 award of non-economic damages, which the trial court later reduced by 5% as required by statute to $4,848,000.00 as the decedent was not wearing a seat belt, was affirmed against a claim for remittitur. The Court of Appeals said:

Defendant next claims that the jury award of $5 million for loss of the decedent's services, gifts. society, and companionship was excessive. We review trial court rulings regarding motions for remittitur for abuse of discretion. *Byrne* at 183. A reviewing court generally will not disturb a jury award for loss of society and companionship "if it is within the limits of what reasonable minds would consider just compensation." *In re Claim of Carr,* 189 Mich.

---

**3.** Examination of the docket entries in this case, a matter of public record, shows that an appeal was taken and then dismissed by stipulation. The parties returned to the trial court and placed a settlement on the record. This certainly suggests the plaintiff got less than the jury's verdict.

App. 234, 238, 471 N.W.2d 637 (1991). Plaintiff presented numerous witnesses who testified about their loss of society and companionship of the decedent— their twenty-two-year-old daughter and sister. Defendant neither objected to these witnesses below nor engaged in cross-examination of them. We find no abuse of discretion in the trial court's denial of defendant's motion for remittitur.

219 Mich.App. at 516, 556 N.W.2d at 536–37.

*Meek v. Dept. of Transp.*, 240 Mich.App. 105, 610 N.W.2d 250 (2000) involved the wrongful death of a young married woman whose vehicle hit a barrier maintained by the Michigan Department of Transportation. In a bench trial, her survivors, not described, were awarded $1,500,000.00 for her conscious pain and suffering of an extremely short duration and $1,500,000.00 for loss of her society and companionship. The award was held not excessive.

*May v. City of Detroit*, 2003 WL 21362985 (June 12, 2003) (unpublished) involved a death of a woman killed by a negligently driven Detroit police vehicle. The decedent likely experienced conscious pain and suffering for "at least a few seconds." The estate was awarded $7,000,000.00, less 25% for comparative negligence, for a total award of $5,250,000. The issue of remittitur was not discussed.

3.

The salient elements of these four cases, plus the salient elements in this case are displayed in tabular form in Exhibit A attached.

VI.

The conclusion to be drawn from the data in Exhibit A is that the five cases are roughly comparable. Neither the parties nor the Court's independent research have come up with any better precedents. While distinctions among the five are obvious, the distinctions are not so gross as to deny a comparison.

The further conclusion to be drawn is that while the 5 million dollar verdict was generous, it was not so far out of line as to be classified as so excessive as to call for a new trial. This means that there is no basis for considering a remittitur and certainly no basis for the Court to reduce it with the option that Smith accept a lower judgment or to call for a new trial.

The fact that had the case been tried to the bench the Court may have decided on a lower figure for non-economic damages is of no moment. The verdict was not the Court's call; it was the jury's call, subject only to the Court's control. As stated in *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14, 19 S.Ct. 580, 43 L.Ed. 873 (1899):

> 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence.

It is for all of these reasons stated above that Botsford's motion has been denied.[4]

SO ORDERED.

4. This decision completes the Court's post-trial obligations in this case.