# United States Court of Appeals for the Federal Circuit

04-1568

GLENAYRE ELECTRONICS, INC.,

Plaintiff-Appellee,

v.

PHILLIP JACKSON and PMJ FAMILY LIMITED PARTNERSHIP,

Defendants-Appellants.

Douglas D. Salyers, Troutman Sanders, LLP, of Atlanta, Georgia, argued for plaintiff-appellee.

Mark D. Roth, Orum & Roth LLC, of Chicago, Illinois, argued for defendants-appellants. With him on the brief was Keith H. Orum. Of counsel was Catherine L. Gemrich.

Appealed from: United States District Court for the Northern District of Illinois

Judge Harry D. Leinenweber

# United States Court of Appeals for the Federal Circuit

04-1568

GLENAYRE ELECTRONICS, INC.,

Plaintiff-Appellee,

v.

PHILLIP JACKSON and PMJ FAMILY LIMITED PARTNERSHIP,

Defendants-Appellants.

_____

DECIDED: April 11, 2006

_____

Before NEWMAN, BRYSON, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge PROST. Dissenting opinion filed by Circuit Judge NEWMAN.

PROST, Circuit Judge.

Phillip Jackson and PMJ Family Limited Partnership (collectively, "Jackson") appeal from the order of the United States District Court for the Northern District of Illinois denying Jackson's motion to set trial on the issue of indirect infringement of United States Patent No. 4,596,900 ("the '900 patent") by Glenayre Electronics, Inc. ("Glenayre"). See Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256 (N.D. Ill. June 29, 2004) ("June 29th Order"). We conclude that, as a matter of law, Jackson has been fully compensated for infringement of the '900 patent by the manufacture and sale of Glenayre's products and the use of the same products by Glenayre's customers. Jackson may not collaterally challenge the district court's previous judgment that he is

entitled to only $2.65 million rather than $12 million in damages for the manufacture, sale, and use of Glenayre's products that infringe the '900 patent, because that judgment, which was affirmed in a previous appeal, disposed of his current argument that he should be awarded greater damages based on the benefits Glenayre's customers enjoyed by using products sold by Glenayre. Furthermore, Jackson is not entitled to a second trial as a matter of right simply because the district court stayed his counterclaims of indirect infringement. We therefore affirm the district court's denial of the motion to set trial.

BACKGROUND

The '900 patent discloses and claims an apparatus for producing control signals in response to receiving predetermined tone signals from remote telephones over a telephone line. Glenayre utilizes this technology in its voicemail server systems, which it manufactures and sells to wireless telephone service companies. These companies in turn incorporate the systems into their networks for further sale and the provision of services to end users.

While the present appeal requires us to review the district court's denial of Jackson's motion to set trial on the issue of indirect infringement by Glenayre, the entire procedural history of this case, in all its complexity, provides necessary context.

Jackson originally filed a patent infringement suit against Glenayre's customers, alleging direct infringement of the '900 patent. Thereafter, Glenayre filed a separate declaratory judgment action. Glenayre sought a judgment of noninfringement with respect to the voicemail server systems that it manufactured and sold to its customers.

The district court stayed the suit against the customers pending resolution of the declaratory judgment suit.

In response to the stay of the suit against the customers, Jackson filed several counterclaims in the declaratory judgment suit. Jackson filed counterclaims against Glenayre for indirect infringement of the '900 patent, and counterclaims against several of Glenayre's customers, named and unnamed in Glenayre's amended complaint, for direct infringement of the '900 patent. The district court first enjoined the counterclaims against the unnamed customers and stayed the counterclaims against the named customers. The court then stayed the counterclaims against Glenayre, reasoning that "Glenayre's liability as an alleged contributory infringer/inducer depends, as a matter of law, on the logically prior determination of liability against one or more direct infringers (i.e., Glenayre's customers)." Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256, slip op. at 2 (N.D. Ill. Sept. 27, 2002) ("Sept. 27th Order"). Because the court had already enjoined and stayed the counterclaims of direct infringement against the customers, the court reasoned that the question of the measure of damages against Glenayre as an alleged contributory infringer/inducer did not present itself at that time. The court therefore stayed the counterclaims of indirect infringement against Glenayre. Jackson then filed a counterclaim against Glenayre for direct infringement of the '900 patent.

The district court ultimately conducted a jury trial on the issue of Glenayre's alleged direct infringement. During the trial, Jackson introduced and relied on evidence of the benefits Glenayre's customers enjoyed by infringing the '900 patent. Furthermore, during closing arguments, Jackson pointed to this evidence and asked the jury to return a verdict that assessed damages in the range of $6.2 million to $15 million

based on a reasonable royalty calculation. The jury returned a verdict in favor of Jackson in the amount of $12 million. After the jury verdict, Jackson voluntarily withdrew an interlocutory appeal in this court seeking reversal of two of the district court's orders enjoining Jackson from pursuing infringement actions against Glenayre's customers. See Glenayre Elecs., Inc. v. Jackson, 66 Fed. Appx. 875 (Fed. Cir. May 29, 2003) ("May 29th Order") (granting Jackson's unopposed motion to voluntarily dismiss his appeal).

Glenayre then submitted a post-trial motion requesting that the district court remit the jury award. In response to Glenayre's motion, Jackson argued that the jury's damages award was reasonable based on the evidence that he adduced at trial showing the benefits Glenayre's customers enjoyed by infringing the '900 patent. Despite Jackson's arguments, the district court granted the motion for remittitur, finding the jury's damages award to be "grossly excessive." Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256, slip op. at 11-17 (N.D. Ill. July 8, 2003) ("Remittitur Order"). The court identified license agreements related to similar technology that Jackson and Glenayre separately negotiated with third parties as constituting the most cogent, probative basis for determining a reasonable royalty for infringement of the '900 patent. These license agreements included various royalty rates calculated as percentages of sales, lump-sum payments, or combinations of these two methods of payment. Furthermore, the court characterized these license agreements as "broadly grant[ing] the right to use every aspect of the '900 Patent"; "conferr[ing] an unrestricted right to use patents covering a complete, complex voicemail system"; or conveying "unbounded rights to use every aspect of the patents" that were the subject of the licenses. Id. at 15. The

court then noted that neither party contested that Glenayre's overall sales of the infringing products during the damages period totaled approximately $40 million. Based on this information, the court determined that "the jury's $12,000,000 damages award reflects a whopping royalty rate of 30%, a rate five times greater than the very highest rate disclosed in any license agreement offered into evidence." Id. at 16. The court concluded that "[t]here is absolutely no support in the record for such an extravagantly high royalty percentage." Id. It ruled that the maximum reasonable royalty would be 6% of sales plus a $250,000 lump-sum payment, and proposed a remittitur to $2.65 million as an alternative to a new trial.

Rather than refuse the remittitur or request a new trial, Jackson accepted the district court's decision to award him the remitted damages award plus prejudgment interest. In response, the court entered judgment under Federal Rule of Civil Procedure 54(b), stating that "additional claims, dependent upon the finality and affirmance of the patent infringement claim against Glenayre, remain for adjudication . . . ." Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256, slip op. at 2 (N.D. Ill. July 22, 2003) ("July 22nd Order"). Glenayre, but not Jackson, appealed. This court summarily affirmed the district court's judgment without issuing an opinion. See Glenayre Elecs., Inc. v. Jackson, 95 Fed. Appx. 344 (Fed. Cir. Apr. 8, 2004). After the judgment was affirmed, Jackson voluntarily dismissed his counterclaims against Glenayre's customers without prejudice, and Glenayre subsequently paid the remitted damages award.

Jackson then filed a motion to set trial on the stayed counterclaims of indirect infringement by Glenayre. The district court denied the motion, stating that the

judgment completely compensated Jackson for direct infringement and therefore there was nothing else owed to Jackson. June 29th Order, slip op. at 2.

In connection with its response to Jackson's motion to set trial, Glenayre filed a motion for sanctions against Jackson and his attorneys for seeking to continue the litigation. The district court denied the motion. In doing so, the court noted that its "previous orders carried some ambiguity as to the continuing viability of Jackson's counterclaims. . . . That said, the Court has also made clear in oral comments and by previous rulings from the bench that no counterclaims survive." Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256, slip op. at 5 (N.D. Ill. Sept. 8, 2004) ("Sept. 8th Order").

Jackson appeals the denial of his motion to set trial on the issue of indirect infringement by Glenayre. We have jurisdiction over the appeal under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I.

As a preliminary matter, the parties disagree as to what standard of review we should apply in this case. Jackson, comparing the denial of the motion to set trial with a grant of a motion for summary judgment or a motion to dismiss for failure to state a claim, submits that we should review the district court's action de novo. See Weinberger v. Wisconsin, 105 F.3d 1182, 1186 (7th Cir. 1997) (summary judgment reviewed de novo); Olson v. Wexford Clearing Servs. Corp., 397 F.3d 488, 490 (7th Cir. 2005) (dismissal for failure to state a claim reviewed de novo). Glenayre characterizes the denial of the motion to set trial as a trial management decision, subject to review for

04-1568                                          6

abuse of discretion.  See Research Sys. Corp. v. IPSOS Publicite, 276 F.3d 914, 919 (7th Cir. 2002).

We treat the district court's denial of the motion to set trial as a dismissal of the counterclaims for failure to state a claim upon which relief can be granted. Consequently, we review the district court's action in accordance with the criteria of Federal Rule of Civil Procedure 12(b)(6).  That is, we review the district court's action de novo.  See Olson, 397 F.3d at 490.  While we must take well-pleaded facts as true and construe all reasonable inferences in favor of Jackson, we are not obligated to accept assertions of law or unwarranted factual inferences.  Stachowski v. Town of Cicero, 425 F.3d 1075, 1078 (7th Cir. 2005).

## II.

Jackson presents this court with two arguments in his effort to obtain a second trial addressing his claims of indirect infringement by Glenayre.  First, as a factual matter, Jackson contends that the district court bifurcated the case into two separate trials, where the first trial would address Glenayre's direct infringement, and the second would address both Glenayre's customers' direct infringement and Glenayre's indirect infringement.  Jackson argues that by doing so the district court preserved his right to a second trial.  He indicates that he relied on the district court's plan to hold the second trial, and that the district court erred by losing sight of its own plan and procedure and denying his motion to set trial.  Next, Jackson, relying primarily on three Supreme Court cases, argues that he has not been fully compensated for infringement of the '900

patent even though he accepted the district court's remittitur and has since collected the $2.65 million damages award plus prejudgment interest.[1]

As we will show, neither of Jackson's arguments persuade us that he is entitled to a second trial addressing indirect infringement by Glenayre. With regard to his first argument, Jackson is wrong in his interpretation of the legal effect of the district court's decision to stay his counterclaims of indirect infringement by Glenayre. The fact that his counterclaims of indirect infringement were stayed does not automatically mean that as a matter of right he is entitled to a second trial to present evidence and argument to a new jury. Jackson is particularly incorrect to the extent he argues that the stay of his counterclaims for indirect infringement automatically means that he is entitled to present the same evidence and arguments on damages to two juries. Further, even assuming that a promise by the district court to hold a second trial would be binding, in reality Jackson was never promised a second trial on indirect infringement.

Without being able to show that he is entitled to a second trial as a matter of right based on the fact that the district court stayed his counterclaims of indirect infringement, we are left with Jackson's argument that as a result of the first trial he did not receive "full compensation" for infringement. Several relevant factors will guide our analysis of this argument. First, Jackson's allegations of indirect infringement are not based on

---

[1] Jackson, apparently conceding that he is not entitled to lost profits, seeks a reasonable royalty based on Glenayre's customers' profits under 35 U.S.C. § 284. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971). Furthermore, because the '900 patent expired before the district court entered its remittitur order, Jackson was not then and is not now entitled to injunctive relief with regard to the '900 patent. Lans v. Digital Equip. Corp., 252 F.3d 1320, 1328 (Fed. Cir. 2001) (indicating that a district court cannot enjoin a party from infringing an expired patent).

conduct other than Glenayre's sales of infringing products to its customers followed by those customers' use of the same products. Thus, his theory is that he is entitled to pursue an additional damages award based on Glenayre's customers' use of infringing products sold by Glenayre, even though he has already collected compensation for direct infringement by Glenayre because of the same sales. Second, in the first trial Jackson actually introduced and relied on evidence regarding benefits Glenayre's customers would experience by using infringing products purchased from Glenayre. Indeed, the jury's $12 million damages award undoubtedly reflected this evidence. Third, Jackson did not refuse the district court's remittitur which purported to compensate Jackson based on a reasonable royalty for broad rights to his patent, see supra p. 4, and in fact collected the remitted damages award. As explained below, these factors lead us to the conclusion that Jackson has fully litigated his full measure of damages such that the remitted damages award that Jackson collected constitutes full compensation as a matter of law for (1) direct infringement of the '900 patent by Glenayre due to its manufacture and sale of infringing products; (2) direct infringement of the '900 patent by Glenayre's customers due to their use of products purchased from Glenayre; and (3) possible indirect infringement of the '900 patent by Glenayre due to its sale of infringing products and the resulting use of those same products by its customers. In short, if the remitted damages award did not constitute full compensation as a matter of fact, it was incumbent upon Jackson to refuse the district court's remittitur. His failure to refuse the remittitur requires that we reject his collateral attack on that judgment in this appeal.

A.

Jackson alleges that various statements and conduct of the district court and Glenayre require that a second trial be held to address his claims of indirect infringement by Glenayre. In our view, however, none of these statements or conduct constitutes a guarantee or promise by the district court that entitles Jackson to a second trial as a matter of right.

Jackson points to the court's statement that "Glenayre's liability as an alleged contributory infringer/inducer depends, as a matter of law, on the logically prior determination of liability against one or more infringers (i.e., Glenayre's customers)" and that "the question of the measure of damages against Glenayre as an alleged contributory infringer/inducer will not present itself until final judgment is rendered in this case." Sept. 27th Order, slip op. at 2. Jackson also points to the court's later clarification of its understanding of the procedural posture of the case:

> Both parties have misperceived the court's order as simply bifurcating the issues of liability and damages. That is not what the order accomplished. Rather, the court's order meant to stay Jackson's counterclaim against Glenayre in its entirety insofar as it is premised on the theory that Glenayre is merely a contributory infringer/inducer, and its customers the direct infringers.

Glenayre Elecs., Inc. v. Jackson, No. 02-CV-256, slip op. at 1 (N.D. Ill. Oct. 9, 2002). Jackson next directs our attention to the fact that the district court sustained one of Glenayre's objections to an exhibit showing that Glenayre indemnified its customers. In addition, he points out that the district court only instructed the jury to calculate Jackson's damages based on Glenayre's profits. He then points to the fact that, prior to the previous appeal, the court entered its judgment pursuant to Federal Rule of Civil Procedure 54(b) "[b]ecause additional claims, dependant on the finality and affirmance

of the patent infringement against Glenayre, remain for adjudication . . . ." July 22nd Order, slip op. at 2.  Jackson further argues that the court admitted that it contemplated adjudicating additional claims beyond the claims resolved in the first trial when it stated that its "previous orders carried some ambiguity as to the continuing viability of Jackson's counterclaims . . . ." Sept. 8th Order, slip op. at 5.  Finally, he argues that Glenayre's actions during the first trial support a second trial, because Glenayre did not at any time seek an order that the claims of indirect infringement were resolved by the judgment of direct infringement.

Contrary to Jackson's assertions, the district court never ensured him a second trial on the issue of indirect infringement by Glenayre.  Rather, the court simply stayed his counterclaims of indirect infringement by Glenayre pending the conclusion of the trial that would address his counterclaims of direct infringement by Glenayre.  See Sept. 27th Order, slip op. at 2 ("Defendant's counterclaim against Glenayre is STAYED pending resolution of the instant declaratory judgment action.").[2]  None of the statements or actions by the district court constitute a promise to hold a second trial, even if it were the case that such a promise is somehow binding.  In staying Jackson's counterclaims for indirect infringement and proceeding with a trial addressing Jackson's

---

[2]     The propriety of the decision by the district court to stay Jackson's counterclaims of indirect infringement pending disposal of his counterclaim of direct infringement is not before us in this appeal.  As mentioned above, after the jury verdict Jackson voluntarily withdrew an interlocutory appeal in this court seeking reversal of two of the district court's orders enjoining Jackson from pursuing infringement actions against Glenayre's customers.  See May 29th Order (granting Jackson's unopposed motion to voluntarily dismiss his appeal).  Furthermore, neither party has argued that it was an abuse of the court's discretion to manage its docket in the way that it did in this appeal.  See Research Sys. Corp., 276 F.3d at 919 (stating that trial management decisions are subject to review for abuse of discretion).

counterclaim of direct infringement, the district court determined to revisit the issue of whether any additional relief was available against Glenayre, if necessary, after the completion of the trial. And once the trial was completed, indeed after the judgment had been affirmed on appeal and Glenayre satisfied the judgment against it, the court considered the parties' contentions, determined that Jackson was not eligible for additional relief in the form of added damages, and therefore ruled that a second trial was not necessary. June 29th Order, slip op. at 2. Having been mistaken in his belief that the district court guaranteed him a second trial, it is irrelevant whether Jackson in fact relied on his mistaken belief. Furthermore, Jackson cannot show that the district court "lost sight" of its own plan and procedure when he cannot show that the district court actually had a plan and procedure to hold a second trial regardless of the outcome of the first.

B.

Jackson next argues that he has not been fully compensated for infringement of the '900 patent by Glenayre's customers. We disagree. As we will now show, by accepting the remitted damages award, Jackson has already been fully compensated for damages incurred by the use of Glenayre's products by Glenayre's customers.

1.

Before reviewing the merits of Jackson's argument that he has not been fully compensated for indirect infringement by Glenayre, it is important to understand what conduct by Glenayre Jackson challenges here. Jackson's allegations of indirect infringement are based solely on Glenayre's sales of infringing products to its customers followed by those customers' use of the same products. Jackson has not identified, in

his complaint, in his briefs to this court, or at oral argument, any other act by Glenayre giving rise to a claim of indirect infringement other than sales of infringing products themselves. When asked at oral argument, Jackson's attorney explained that Jackson's complaint did not need to allege specific acts of indirect infringement due to the lenient standard of notice pleading, and that discovery would be needed to identify specific acts. But Jackson's complete failure to identify even a category or type of indirectly infringing act, again other than Glenayre's directly infringing sales of its products, militates against allowing Jackson to begin a fishing expedition in the form of a second trial. Properly understood, then, Jackson seeks to recover an additional damages award solely based on Glenayre's customers' use of products manufactured and sold by Glenayre.

To prove his case of indirect infringement by Glenayre, Jackson must show that Glenayre's customers directly infringe the '900 patent. See Novartis Pharms. Corp. v. Eon Labs Mfg., Inc., 363 F.3d 1306, 1308 (Fed. Cir. 2004) ("When indirect infringement is at issue, it is well settled that there can be no inducement or contributory infringement absent an underlying direct infringement."); Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement."). And at least in cases like this one, where a patentee alleges that a manufacturer contributes to and induces infringement by its customers simply because it sells infringing products to its customers, damages assessed for indirect infringement normally will be the same as damages that would be

assessed had the patentee sued and obtained a judgment against the customers. See Jerry R. Selinger & Jessica W. Young, Suing an Infringing Competitor's Customers: Or, Life under the Single Recovery Rule, 31 J. Marshall L. Rev. 19, 52 (1997) ("[A] patentee who suffers lost profits or loss of royalty income ordinarily can be compensated and made whole by the manufacturing infringer. In the usual course of events, the length of the accused manufacturer's distribution chain should have no impact on the patentee's ability to be made whole by the manufacturer."). Indeed, in most cases damages assessed for indirect infringement will be equal to damages assessed for the underlying direct infringement. See 7 Donald S. Chisum, Chisum on Patents § 20.03[7][b][iv] (2001) ("In many instances the appropriate measure of monetary relief against an indirect infringer (i.e. one who contributes to or induces infringement) will be the same as that against the direct infringer." (footnotes omitted)). This case does not fit within one of the exceptions to the basic rule, such as "when the indirect infringer does not cause the original infringement but merely prolongs an infringing use of a product by providing supplies or spare parts." Id. See also, e.g., Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 508 (1964) ("Aro II") (noting that, in a proper case against a contributor infringer that prolongs use of an infringing product, a patent owner might be able to obtain an injunction; recover damages based on the prolongation of the use; obtain punitive or increased damages for willful or bad-faith infringement; and perhaps damages primarily caused by the direct infringer when those damages could not be recovered from the direct infringer); King Instrument Corp. v. Otari Corp., 814 F.2d 1560, 1563-64 (Fed. Cir. 1987) (authorizing separate proceedings to resolve the appropriate amount of damages for (1) infringing sales of machines and (2) potential

04-1568                                    14

indirect infringement in the form of sales of spare parts, including spare parts used for reconstruction to extend the useful life of the machines and spare parts associated with new machine sales for which the patentee had not already been compensated).

At the root of Jackson's argument, as made abundantly clear in his briefs to this court, is his belief that the district court should not have remitted the jury's $12 million damages award to $2.65 million. In Jackson's view, had the district court allowed the jury to consider the customers' use of the voicemail server systems sold by Glenayre, there would have been no basis for remitting the damages award because the jury's damages award would have been supported by evidence showing the amount of profits earned by the customers. Jackson seeks a second trial to submit this evidence to a new jury. He cites Georgia-Pacific, and argues that several of the factors that opinion identifies permit inquiry into customers' profits.[3] According to Jackson, a reasonable royalty should be based on evidence of the "use" of the patented invention. He argues that the district court prohibited introduction of evidence of Glenayre's customers' use of Jackson's patent or of the customers' profits from such use during the first trial. Jackson admits he argued before the district court that the hypothetical negotiation at

---

[3] Specifically, on appeal Jackson points to the following factors:

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

. . . .

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

. . . .

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

Georgia-Pacific, 318 F. Supp. at 1120.

the time of infringement would reference the liability and potential damages that result from indemnification agreements from previous sales. Jackson points out, however, that the district court sustained an objection to an exhibit that related to Glenayre's indemnification of its users. Jackson also objects to the district court's jury instruction as "preventing" the jury from considering the profitability of consumers' use of the invention. Only after each of these logical steps does Jackson argue that, in the absence of this second trial, he has not received "full compensation" for infringement of the '900 patent. See Birdsell v. Shaliol, 112 U.S. 485 (1894); Union Tool Co. v. Wilson, 259 U.S. 107 (1922); Aro II, 377 U.S. at 476.

2.

Based on our understanding of what Jackson seeks to litigate here, the proper amount of a reasonable royalty based on Glenayre's customers' infringing use of products purchased from Glenayre, it is clear that this issue is the same as one of the issues resolved in the first trial. Thus, Jackson's theory is that he has an absolute, inviolable right to pursue an additional damages award based on Glenayre's customers' use of infringing products sold by Glenayre, even though he has already collected compensation for direct infringement by Glenayre because of the same sales. We disagree.

The problem with Jackson's argument is that at the first trial Jackson actually introduced evidence showing the customers' anticipated profits from using Glenayre's products; the district court determined the highest possible royalty Glenayre was entitled to collect for infringing use as being based solely on Glenayre's sales. Remittitur Order, slip op. at 15. Jackson recognized that the remitted award was based on Glenayre's

customers' use; and yet Jackson accepted the district court's judgment. In other words, Glenayre has shown that the same issue Jackson seeks to litigate in a second trial was before the district court during the first trial and that the issue was actually litigated to a final, unappealed judgment.[4]

Even a cursory review of the record shows that Jackson presented evidence and arguments regarding customer use to the jury and judge during and after the first trial. For example, in closing arguments, Jackson asked the jury to calculate damages based on Glenayre's customers' use of the patented invention:

> But let's assume you look at that period and you have 40 million or more in sales in that period. But what you also have in this 1.5-year period -- let's just take that 3.3 million that a user gets [per year] times -- and they said they have 50 million users [per year], that's 165 million -- times -- we can take it times 1.5, it should be. That's about 250 [million], or thereabouts.
> So, you could take that times 6%, and that gets you about -- that's around 15 [million]. And if you do it at the low end, it's 6.2 [million].

(J.A. 4110.) Ignoring Jackson's noticeable mathematical leap,[5] Jackson was clearly attempting to steer the jury away from the relatively low royalty base of $40 million to the relatively high royalty base of $250 million, which was based on customer use. Jackson apparently succeeded. The jury agreed upon a damages figure that was within the range that Jackson identified: $12 million is, obviously, between $6.2 million and $15 million; it is about 5% of $250 million.

---

[4] There is no question that Jackson was fully represented in the prior action. Not only was he a party to the previous trial and appeal, but he was represented by counsel, albeit apparently different counsel than appear before us in this case.

[5] It is unclear how multiplying 3.3 million by 50 million can result in 165 million. The obvious omission in the explanation of how the jury should calculate the award might relate to the error discussed in footnote 7.

Furthermore, in responding to Glenayre's post-trial motion for a remittitur, Jackson explained that the jury's damages calculation was supported by evidence he adduced at trial. He explained that "[t]here was trial evidence presented on nearly every one [of the Georgia-Pacific] factors." See Georgia-Pacific, 318 F. Supp. at 1120. Specifically, he pointed to evidence showing the following "benefits to those who have used the invention," which is how he characterized the ninth factor identified in Georgia-Pacific[6]:

- Glenayre promotes the benefits of its voice mail systems to end users as one of its key selling points (Tr. 241-42).
- Users can achieve a full payback of the system cost in 13 months or even as little as five months (Tr. 242, 244-45; DX-79, DX-80).
- Each system can earn as much as $3.3 million per year per 100,000 subscribers (Tr. 250-51; DX-100). Since Glenayre has 50 million subscribers for its MVP equipment (Tr. 240; DX-237), its MVP equipment base can earn more than $164 million per year or nearly $250 million for the 18 month damage period (Tr. 674, 677).

(J.A. 4291-94.) While Jackson's math was obviously errorneous,[7] the fact that Jackson pointed out evidence regarding benefits to Glenayre's customers to the district court in

---

[6] The ninth factor is:
9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
Georgia-Pacific, 318 F. Supp. at 1120.

[7] After dividing 50 million subscribers by 100,000 subscribers and multiplying the result by $3.3 million, the "MVP equipment base" should have been $1.65 billion per year, or nearly $2.5 billion for the 18 month damages period, instead of $250 million. In short, it appears that somewhere Jackson cut himself short by a factor of ten. Perhaps the facially erroneous calculations explain why the district court did not even refer to Jackson's argument in its decision explaining the grounds for remittitur. See generally Remittitur Order. On the other hand, 6% of $2.5 billion is $150 million, which of course would make the jury's determination of damages, $12 million, seem low rather than high. Regardless, Jackson did not appeal the district court's remittitur, and moreover Jackson has collected the $2.65 million judgment plus prejudgment interest. We therefore cannot disturb the district court's remittitur in this appeal.

an attempt to prevent Glenayre from succeeding on its motion for a remittitur shows that the issue of the reasonableness of a damages award based on customers' use of Glenayre's products was contested immediately after the trial. The unavoidable conclusion is that Jackson did present arguments to both the jury and the judge supporting a damages award based on evidence of the benefits consumers experienced by infringing the '900 patent.

Although Jackson presented evidence and arguments regarding customer use to the jury and judge, the district court based the damages award on other evidence showing the value of using the '900 patent. As discussed above, the court chose instead to rely on contemporaneous license agreements to reach its conclusion that $2.65 million is the "highest possible royalty rate the jury could have properly awarded" for "broad" and "unbounded" rights "to use every aspect" of the '900 patent and other patents covering similar technology. Remittitur Order, slip op. at 15. In other words, the remitted damages award reflects the district court's best judgment as to the value of using the '900 patent. If Jackson believed that the remittitur would not fully compensate for these broad rights, he should not have accepted it.

The remittitur reduced the jury's damages award by $9.35 million plus the associated amount of prejudgment interest. Jackson chose to accept it. The appropriate amount of damages based on the benefits customers experienced by use of products that infringe the '900 patent has been litigated to a final judgment, which is not appealable. See Donovan v. Penn Shipping Co., 429 U.S. 648, 650 (1977) (holding that a plaintiff may not appeal from a remittitur order he has accepted). In this situation,

Jackson is precluded from arguing here that the remittitur was improper, or that he was not fully compensated for infringement of the '900 patent.

To summarize, the problem here boils down to the fact that Jackson accepted the district court's remittitur, which rejected the same argument he makes here, that a jury should award damages based on evidence showing the benefits of Glenayre's customers' infringing use of Glenayre's products. Even if Jackson were to succeed in convincing a new jury that the customers directly infringe the '900 patent, the issue of the appropriate damages award based on that infringement has already been litigated to a final judgment. Jackson is therefore barred from raising arguments before us that he chose not to raise in the prior appeal.

3.

In effect, Jackson attempts an end run around his collected, unappealable remitted damages award by arguing that that award does not fully compensate him for infringement of the '900 patent. In the attempt, Jackson misapplies three Supreme Court cases, Birdsell, Union Tool, and Aro II, failing to come to terms with the significance of the fact that, after we affirmed the district court's judgment, Glenayre subsequently paid the remitted damages award to Jackson in full. We will summarize the facts and the holdings of the three Supreme Court cases, addressing the applicability of each separately.

a.

The Birdsell case involved alleged infringement of a patent for an improvement in machines for threshing and hulling clover-seed. The inventor, Mr. Birdsell, granted to Birdsell Manufacturing Company an exclusive license to make, vend, and use his

invention.  He later sued Ashland Machine Company ("Ashland") for making and selling infringing machines, but did not join Birdsell Manufacturing Company.  In that suit, a permanent injunction was entered against Ashland, but only one dollar in nominal damages was awarded to Mr. Birdsell because Ashland had made no profits.  And while damages sustained by the Birdsell Manufacturing Company were proved and claimed, these damages could not be awarded because the company was not a party to the case.  Ashland, after paying the nominal damages award, but during pendency of the suit, became insolvent.  Birdsell and Birdsell Manufacturing Company then together sued two individuals who had used one of the machines manufactured by Ashland.  The circuit court held that because Birdsell Manufacturing Company, although not a named party, was in reality a co-plaintiff in the previous suit, because the suit was final, and because nominal damages had been paid, Birdsell and Birdsell Manufacturing Company were estopped from suing the two individuals in the present suit.

Birdsell and Birdsell Manufacturing Company objected on three grounds:  (1) that Birdsell Manufacturing Company was not a party to the first suit; (2) that the two individuals were not parties to the first suit; and (3) that only nominal damages were recovered and paid.  The Supreme Court reversed the circuit court.

The Supreme Court apparently adopted Birdsell and Birdsell Manufacturing Company's first objection.  It stated that

> when a suit in equity has been brought and prosecuted, in the name of the patentee alone, with the licensee's consent and concurrence, to final judgment, from which, if for too small a sum, an appeal might have been taken in the name of the patentee, we should hesitate to say that the licensee, merely because he was not a formal plaintiff in that suit, could bring a new suit to recover damages against the <u>same defendant</u> for the same infringement.

<u>Birdsell</u>, 112 U.S. at 487 (emphasis added). In other words, the Supreme Court likely would not allow Birdsell and Birdsell Manufacturing Company to sue the same defendant that Birdsell alone sued in the first suit. But because this case involved a different defendant, two of Ashland's customers rather than Ashland itself, the Court seemed to indicate that estoppel would not apply.

The Court framed the second objection as raising the "more serious question" of "whether a decree in favor of the patentee, upon a bill in equity against one person for making and selling a patented machine, is a bar to a subsequent suit by the patentee against another person for afterwards using the same machine within the term of the patent." The Court began by summarizing the first sale doctrine articulated in <u>Adams v. Burke</u>, 84 U.S. 453 (1873), which releases licensees and downstream users from liability for patent infringement. It then stated:

> But an infringer does not, by paying damages for making and using a machine in infringement of a patent, acquire any right himself to the future use of the machine. On the contrary, he may, in addition to the payment of damages for past infringement, be restrained by injunction from further use, and, when the whole machine is an infringement of the patent, be ordered to deliver it up to be destroyed. No more does one, who pays damages for selling a machine in infringement of a patent, acquire for himself or his vendee any right to use that machine. In the case of a license or a sale by the patentee, the rights of the licensee or the vendee arise out of contract with him. In the case of infringement, the liability of infringers arises out of their own wrongful invasion of his rights. The recovery and satisfaction of a judgment for damages against one wrong-doer do not ordinarily confer, upon him or upon others, the right to continue or repeat the wrong.

<u>Birdsell</u>, 112 U.S. at 487-88 (citations omitted). In this way, the Court seemed to decide that while the collection of license fees may trigger the first sale doctrine, the collection of damages for infringement does not. Thus, because Birdsell had collected damages rather than a license fee from Ashland, Birdsell and Birdsell Manufacturing Company

would not be precluded by the first sale doctrine from maintaining a suit against Ashland's customers.

The Court went further, however, to address Birdsell and Birdsell Manufacturing Company's third objection. In doing so, the Court appears to have limited the scope of its holding with regard to the second objection:

> If one person is in any case exempt from being sued for damages for using the same machine for the making and selling of which damages have been recovered against and paid by another person, it can only be when actual damages have been paid, and upon the theory that the plaintiff has been deprived of the same property by the acts of two wrong-doers, and has received full compensation from one of them. . . . [A] judgment for nominal damages against one wrongdoer does not bar a suit against another for continuance of the wrong.

Id. at 488-89. In this way, the Court suggested, but in light of the facts before it did not decide, that recovery of actual damages, rather than nominal damages, from a maker and seller of a product would bar a suit against a buyer and user of the same product.

Contrary to Jackson's contentions, Birdsell does not support granting Jackson a second trial. In fact, Birdsell supports our conclusion that in the circumstances of this case Jackson is precluded from relitigating the issue of the appropriate amount of damages based on Glenayre's customers' infringing use of products purchased from Glenayre.

Jackson's situation differs from Mr. Birdsell and Birdsell Manufacturing Company's situation in important ways. For example, Jackson, unlike Mr. Birdsell, did not recover nominal damages in the first trial. Rather, Jackson recovered actual damages. Thus, Jackson's situation fits nicely within the situation contemplated by the Court in responding to Mr. Birdsell and Birdsell Manufacturing Company's third objection. That is, a party is precluded from suing to collect damages for direct

infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product. Applied to this case, Jackson is precluded from suing to collect damages for direct infringement by Glenayre's customers because actual damages have already been collected from Glenayre and Glenayre's customers simply use infringing devices made and sold by Glenayre.[8]

b.

Jackson similarly misapplies Union Tool. In that case, the patentee Mr. Wilson moved the district court to hold that Union Tool Company ("Union Tool") and a number of its officers were in contempt of court for violating a permanent injunction. The injunction had issued after the Supreme Court denied a petition for a writ of certiorari to review a Ninth Circuit decision affirming the district court's decree for an injunction and accounting for the infringement of a patent for underreamers. Once issued, the injunction forbade Union Tool and its officers from manufacturing and selling infringing machines, as well as parts or elements that might be used in combination to infringe Mr. Wilson's patent.

In the contempt hearing, the district court concluded that Union Tool and its officers did sell both infringing machines and spare parts to be used with machines that the company previously sold. The district court entered a finding of contempt with respect to the sale of infringing machines, but not with respect to the sale of spare parts.

---

[8] In our view the fact that Jackson is suing the same party, the first time for direct infringement and second time for indirect infringement for the same acts, the sale of infringing products, does not alter the applicability of Birdsell. If anything, as discussed above, the fact that the same party has been sued twice bolsters the case for precluding Jackson from collaterally attacking the previous judgment.

The Ninth Circuit reversed the district court in part, holding the company in contempt for the sale of the spare parts. The Supreme Court took the case to review the Ninth Circuit's reversal of the district court's decision not to hold the company in contempt for the sale of the spare parts.

After disposing of arguments related to appellate jurisdiction and procedure, the Supreme Court addressed the merits of the dispute:

> On the merits the contention is this: The interlocutory decree awards to Wilson, among other things, compensation by way of damages and profits, for employing the invention in any machine sold prior to the service of the injunction. A patentee, in demanding and receiving full compensation for the wrongful use of his invention in devices made and sold by a manufacturer adopts the sales as though made by himself, and therefore necessarily licenses the use of the devices, and frees them from the monopoly of the patent. This license continues during the life of the machine; it does not end when repairs become necessary. Spare parts are needed for repairs. Those here in question were sold for use in, and repair of, machines marketed by the company before the service of the injunction. Therefore, it is argued, the sale of these parts is licensed and thus not a violation of the injunction. But to this argument which prevailed in the District Court, there are several answers; and, among them, this. It does not appear that Wilson has received any compensation whatever for the infringement by use of these machines. Compare Birdsell v. Shaliol, 112 U.S. 485, 487-89. There was, consequently, no implied license to use the spare parts in these machines. As such use, unless licensed, clearly constituted an infringement, the sale of the spare parts to be so used violated the injunction. And the sale having been made with full knowledge of all relevant facts the Court of Appeals properly held that, so far as Wilson had sought remedial, as distinguished from punitive action, the District Court was not justified in purging the petitioner of contempt arising from the sale of spare parts.

Union Tool, 259 U.S. at 113-14. In this short discussion the Supreme Court indicated, consistent with the suggestion in Birdsell, that when a patentee receives full compensation for the wrongful use of an invention in devices made and sold by a manufacturer, the patentee effectively adopts the sales by the manufacturer such that purchasers and users of the devices receive implied licenses that free them from liability

for infringement of the patent.  But the facts of <u>Union Tool</u>, like <u>Birdsell</u>, did not involve a patentee that <u>had</u> received full compensation:  while in <u>Birdsell</u> the patentee received nominal damages, in <u>Union Tool</u> the patentee did not receive any compensation.

If the patentee and licensee in <u>Birdsell</u> were not estopped from suing to obtain full compensation when they had only received nominal damages, so much more appropriate is the holding in <u>Union Tool</u> that the patentee should be able to sue to obtain full compensation when the patentee has obtained no damages whatsoever.  But in stark contrast to the facts of <u>Birdsell</u> and <u>Union Tool</u>, here Jackson has already received actual damages for the manufacture and sale of infringing devices which explicitly were a measure of the royalty for full rights in the patent.  Thus, consistent with the indication in both <u>Birdsell</u> and <u>Union Tool</u>, Jackson has adopted Glenayre's sales as though those sales were made by him.  He therefore, as a matter of law, has licensed the use of those products and freed the products from the exclusive right conferred by the '900 patent.  Jackson does not, indeed cannot, argue that the damages he already collected, $2.65 million plus prejudgment interest, were either nominal or nonexistent.  And as discussed above, he also cannot collaterally attack the remittitur, which he accepted, by arguing in this appeal that those damages do not fully compensate him.  Thus, the Supreme Court's reasoning in both <u>Birdsell</u> and <u>Union Tool</u> support our holding that Jackson is not entitled to a second trial.

c.

Finally, Jackson also is mistaken in his reliance on <u>Aro II</u>.  Jackson argues that <u>Aro II</u> requires that a comparison be made between a damages figure calculated based on the infringing conduct of all potentially liable parties and the amount of damages

actually received by the patentee. According to Jackson, if the amount of damages actually received does not equal the calculated damages figure, then the patentee has not been fully compensated. In Jackson's view the patentee may receive remaining compensation from any joint-tortfeasor. In this regard, Jackson separates the issues of Glenayre making and selling infringing devices from the customers using the devices, and states that the use of the devices creates most of the compensation to which he is entitled. He now seeks to obtain a second trial to have a second jury consider the use of the devices by Glenayre's customers, where he alleges that Glenayre is liable for those damages under the doctrine of indirect infringement. He points out that in Aro II, the Supreme Court remanded the case for a determination whether any damages in addition to damages for direct infringement were owed by a contributory infringer.

The Supreme Court resolved several contested issues in its opinion in Aro II, most of which are raised in cases, unlike this one, involving allegations that a party contributes to direct infringement by prolonging use of an infringing device, for example by selling parts used to repair an infringing device. As with Birdsell and Union Tool, we will summarize the entire case, for the full context is helpful in understanding the relevance and meaning of particular language used by the Supreme Court in its opinion.

Aro II involved a patent covering a top-structure for convertible automobiles. Ford and General Motors ("GM") included the structures in their 1952-54 model convertibles. GM had a license to do so; Ford did not, and so infringed. In 1955, however, Ford entered into a settlement agreement with the patent owner, Automobile Body Research Corporation ("AB"). Aro Manufacturing ("Aro"), which never entered into

a license with the patent owner, sold fabric components designed as replacement tops for the structures used in Ford and GM's 1952-54 model convertibles.

Convertible Top Replacement Co. ("CTR"), which obtained exclusive rights in Massachusetts to the patent at issue through an assignment from AB, sued Aro in 1956, alleging contributory infringement. In <u>Aro Manufacturing Co. v. Convertible Top Replacement Co.</u>, 365 U.S. 336 (1961) ("<u>Aro I</u>"), the Supreme Court, addressing the patentee's right to relief with regard to GM cars only, <u>Aro II</u>, 377 U.S. at 479, held that Aro merely enabled its customers to repair rather than reconstruct convertible tops and so did not contributorily infringe. <u>Aro I</u>, 365 U.S. at 346 ("[T]he replacement of the fabric involved in this case must be characterized as permissible 'repair,' not 'reconstruction.'"). In <u>Aro II</u>, the Supreme Court granted certiorari to consider whether Aro was liable for contributory infringement with respect to manufacture and sale of replacement fabrics for the Ford cars.

Justice Brennan, the authoring justice in <u>Aro II</u>, divided his opinion into four parts that address the merits of the parties' contentions. Parts I and III express the views of the Court, that is a majority of the justices. Part II and IV express the views of four justices. As to Part II, Justice Harlan concurred in the result, but did not write a separate concurrence. As to Part IV, Justice Harlan considered the matter discussed, calculation of damages by the lower courts on remand, not ripe for decision.

In Part I, the Court analyzed the case as if Ford had never obtained its settlement agreement with the patent owner. On this assumption, the Court determined that Ford, lacking authority to make and sell infringing structures, could not confer on purchasers of its convertibles an implied license to infringe, and therefore both Ford and its

customers infringed. Because the owners' use of the structure infringed, so too did the repair of the structure by replacing worn-out fabric, because "[w]here use infringes, repair does also, for it perpetuates the infringing use." Aro II, 377 U.S. at 484. The Court also determined, again under the assumption that Ford never obtained its release, that Aro acted as a contributory infringer by supplying replacement fabrics for use in infringing repair by Ford convertible owners. In this regard, the Court concluded that the contributory infringement statute "does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." Id. at 488. According to the Court, Aro clearly had the requisite knowledge for one part of the relevant time period, but the Court remanded the case for findings as to the other part.

In Part II, four justices, with Justice Harlan concurring in the result, expressed their view regarding the effect of Ford's 1955 settlement agreement on Aro's liability for sales of replacement fabrics. The justices addressed the effect of the settlement agreement on previous sales separately from the effect on future sales. They determined that the agreement's attempt to reserve rights in connection with future sales of replacement fabric was invalid because the agreement authorized Ford car owners to use the patented structures, and so authorized the owners to repair the structures as held in Aro I. "When the patentee has sold the patented article or authorized its sale and has thus granted to the purchaser an 'implied license to use,' it is clear that he cannot thereafter restrict that use; 'so far as the use of it was concerned, the patentee had received his consideration, and it was no longer within the monopoly

of the patent.'" Id. at 497 (quoting Adams, 84 U.S. at 456).  The justices explained that

this holding was not inconsistent with Birdsell and Union Tool:

> Both cases turned upon the fact that the patentee had not collected on the prior judgment and thus had not received any compensation for the infringing use—or, indeed, any compensation at all.  Here, in contrast, the amount paid by Ford under the agreement was expressly stated to include compensation for the use of the patented structures by Ford's purchasers; moreover, the agreement covered future use and in this respect operated precisely like a license, with the result that after the agreement date there was simply no infringing use for which the patentee was entitled to compensation.  See Birdsell v. Shaliol, 112 U.S. at 487.

Id. at 499 (emphases added) (footnote omitted).  In a footnote, the justices further

explained how they distinguished the facts of Birdsell and Union Tool:

> In Birdsell the Court relied on the fact that only nominal damages had been awarded in the prior suit.  In Union Tool the Court's statement that the patentee had not "received any compensation whatever for the infringement by use of these machines," 259 U.S. at 113, was apparently based on the fact that the damages and profits awarded by the prior judgment had not yet been calculated or paid.

Id. at 499 n.14 (citations omitted).

In Part III, the Court addressed the effect of the settlement agreement on the

previous sales.  The Court determined that the agreement releasing Ford and its

customers from liability did not negate Aro's liability for its sales because Aro's

contributory infringement had already taken place at the time of the agreement and the

agreement did not purport to release Aro from liability.  After recognizing that a

contributory infringer is a species of joint-tortfeasor, the Court rejected the applicability

of the old common-law rule that a release given to one joint-tortfeasor necessarily

released another, because the rule had been repudiated by statutes, court decisions,

the overwhelming weight of scholarly authority, and the Supreme Court in Birdsell.  The

Court summarized the rule set forth in Birdsell by quoting from a leading treatise on

torts: "By our law, judgment against one joint trespasser, without full satisfaction, is no bar to a suit against another for the same trespass." Id. at 501. The Court then stated: "What is true of a judgment is true of a release. A release given a direct infringer in respect of past infringement, which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights." Id. (citation omitted). Applying this rule to the facts at issue in Aro II, the Court held that "[t]he mere fact that the agreement released Ford and Ford's customers for their past infringement does not negate Aro's liability for its past infringement." Id.

Finally, in Part IV, four justices deemed it in the interest of efficient judicial administration to express their views on the measure of damages that CTR would be entitled to collect as a result of Aro's contributory infringement. Thus, while Part III addressed Aro's liability for contributory infringement, Part IV addressed the appropriate amount of damages Aro would be required to pay for contributory infringement for which it was liable. "If the sum paid by Ford for the release of it and its customers constituted full satisfaction to AB for the infringing use of the patented structures, we think it clear that CTR cannot now collect further payment from Aro for contributing to the same infringing use." Id. at 502-03. According to the justices,

> if "actual damages" or "full compensation" paid by a maker-and-seller can have the effect of releasing a user, as was indicated in Birdsell, such a result should follow a fortiori where, as here, the damages paid were expressly stated to be compensation for use of the device, and the person subsequently sued is a contributory infringer liable merely for contributing to the same infringing use. In such a case full payment by or on behalf of the direct infringer leaves nothing to be collected from the contributory infringer.

Id. at 503. Based on this understanding of the law, the justices found it necessary to consider whether Ford's payment to AB fully compensated AB for the infringing use committed directly by Ford's purchasers and contributorily by Aro.

The justices disagreed with the assumption that a judgment holding Aro liable for contributory infringement would result in damages in the form of a royalty on Aro's sales. After reviewing the 1946 amendment to the patent laws and concluding that it eliminated the recovery of infringers' profits in favor of the recovery of the patent owner's damages, the justices addressed what they deemed to be the ultimate question of how much CTR suffered by Aro's infringement, that is, how much CTR would have made if Aro had not infringed. To answer this question, the justices first assumed that, contrary to the facts of the case, there was no Ford settlement agreement. In this circumstance, they determined that CTR was not deprived of a royalty on Aro's sales because such a royalty would violate the prohibition on patentees deriving their profit, not from sales of the patented invention, but from sales of unpatented supplies used with the patented invention. At the same time, however, the justices identified other remedies CTR could obtain in the face of Aro's contributory liability:

> It could in a proper case obtain an injunction; it could recover such damages as had actually been suffered from the contributory infringement by virtue of the prolongation of the use of the infringing automobiles; it could in a case of willful or bad-faith infringement recover punitive or "increased" damages under the statute's trebling provision; and it could perhaps—we express no view on the question—recover from Aro a royalty on Ford's sales of the patented top-structures, even though such damages were primarily caused not by Aro's infringement but by Ford's, in a case where they could not be recovered from Ford or Ford's customers. It is difficult to conceive of any instance, however, in which actual damages could properly be based on a royalty on sales of an unpatented article used merely to repair the patented structure.

Id. at 508.

Then the justices analyzed the case taking into consideration the Ford settlement agreement. They assumed that the amount received by AB under the settlement agreement was the same amount AB would have received had it licensed Ford in the first place to produce convertible tops, and on this assumption concluded that CTR's pecuniary position was not rendered one cent worse by the total infringement to which Aro contributed. They determined, however, to allow the patentee to test their assumption on remand. The justices then reviewed various policy reasons not to allow a patent owner to recovery a royalty on Aro's sales after receipt of the equivalent of a royalty on Ford's sales. The primary concern was the first-sale doctrine articulated in Adams, and the justices expressed their view that to allow a patent owner to double his rewards would violate the purchaser's long-established right to use and repair an article that has been legally purchased from the patentee, where the purchase price compensates the patentee for the use of the article.

The justices also considered the purpose of the contributory infringement doctrine, "to provide for the protection of the patent rights where enforcement against direct infringers is impracticable." Id. at 511 (quoting H.R. 5988, 80th Cong., 2d Sess.; H.R. 3866, 81st Cong., 1st Sess.). They went on:

> Such a purpose might have been applicable here if CTR and AB had been unable to enforce the patent against Ford (a rather unlikely event), since it would indeed have been impractical to sue every one of the car owners. But where the patentee has in fact enforced the patent against so solvent and accessible a direct infringer as Ford, it is difficult to see why it should then be allowed to invoke the contributory infringement doctrine— designed for cases "where enforcement against direct infringers is impracticable"—so as to enforce the patent a second time and obtain a reward that it could not extract from a direct infringer alone. Whatever the result might have been under the old "damages and profits" provision, no such perversion of the congressional purpose is possible within the rule allowing recovery of "damages" only.

Id. at 511-12. The justices again recognized the significance of the 1946 amendment replacing the recovery of infringers' profits with the recovery of the patent owner's damages. They summarized their opinion:

> Hence we think that after a patentee has collected from or on behalf of a direct infringer damages sufficient to put him in the position he would have occupied had there been no infringement, he cannot thereafter collect actual damages from a person liable only for contributing to the same infringement. This principle is but an application of the rule that full satisfaction received from one tort-feasor prevents further recovery against another. It is consistent with the Court's opinion in Birdsell.

Id. at 512. They also contrasted the facts of their case with a case decided by the Second Circuit:

> In [Farrand Optical Co. v. United States, 325 F.2d 328 (2d Cir. 1963)] . . . the payment by the direct infringer was made under judicial decree, and there could thus be no question but that it represented full compensation for the infringing use. Where a private release of past infringement which does not purport to release others is involved, the adequacy of the compensation must always be a question of fact. Hence here, while it seems unlikely that Ford's payment under the agreement was any less than would have been paid under a license—that is, anything less than full satisfaction to AB for the infringing use committed directly by Ford's purchasers and contributorily by Aro—we think the case must nevertheless be remanded for findings on the question. We would also allow the lower courts to consider whether Aro's conduct has been such as to warrant an award of punitive or increased damages, although we think that very unlikely.

Id. at 513.

The holding of the Court in Part I and the view of the four justices in Part II of Aro II address scenarios we do not see before us in this case. Part I resolved issues raised by alleged contributory infringement in the form of sales of materials used to perpetuate infringing use, a situation simply not present here. Part II addressed the effect of a settlement agreement on sales of products occurring after the settlement agreement. An analogous situation does not present itself in this case. Jackson, for example,

neither alleges that Glenayre continued to sell infringing products after Jackson accepted the remitted damages award, nor does he allege that Glenayre committed indirect infringement after he accepted the remitted damages award. Nor could he in light of the fact that the '900 patent expired before the district court remitted the damages award.

The holding of the Court in Part III of <u>Aro II</u> also does not require that we grant Jackson a second trial so that Jackson can attempt to obtain a second damages award against Glenayre. In Part III, the Court addressed the <u>liability</u> of Aro as a contributory infringer for actions it took before Ford and AB entered into the settlement agreement. The Court did not address damages. As applied to this case, the Court's holding in Part III only means that, had Glenayre not paid the damages award which was calculated to fully compensate Jackson for all rights in the patent, Jackson could have sued Glenayre's customers to hold them liable for their extant infringement in order to collect full compensation. Of course, Glenayre did pay the damages award.

Regardless, the question of whether Glenayre's customers are <u>liable</u> for actions they took before Jackson accepted the remittitur is not before us in this appeal. We need not and do not resolve that question. Nor could we, as Glenayre's customers are not parties to this appeal. We are tasked, however, with resolving the question of whether Jackson may now litigate damages from Glenayre based on Glenayre's customers' direct infringement. Thus, in an indirect way, we reach the same issue.

Importantly, in <u>Aro II</u> the Court held that "[a] release given a direct infringer in respect of past infringement, which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights." <u>Id.</u> at 501. In

contrast, in this case the judgment of the district court after the first trial did not clearly intend to save Jackson's rights against Glenayre to the extent it is also a past indirect infringer by way of Glenayre's customers' past use of products sold by Glenayre. Rather, the remitted award purported to compensate Jackson based on negotiations of a broad license for his patent. Thus, as discussed above, Jackson is precluded from obtaining a second trial against Glenayre to relitigate the same issue.

Stated another way, the judgment, affirmed on appeal, forecloses Jackson from the opportunity of obtaining a second bite at the apple, where the apple is a reasonable royalty based on the benefits Glenayre's customers enjoyed by use of products sold by Glenayre. To hold otherwise would be to empower a patentee to obtain trial upon trial against the same party where it could relitigate issues regarding damages that it lost in previous trials. There is no reason that we would allow a patentee to obtain a new trial to litigate its entitlement to damages for buyers' and users' infringement when the patentee already completed a previous trial that resulted in a damages award based on the very same concept against the very same party. To allow the patentee to follow this path would be to permit the patentee to relitigate his or her entitlement to "full compensation" with the same adversary a number of times that is equal to the number of steps that a product takes in the path of commerce. The inappropriateness of the proposition is apparent.

In this regard our holding does not conflict with Shockley v. Arcan, Inc., 248 F.3d 1349, 1364 (Fed. Cir. 2001). In that case, this court stated:

> Furthermore, other courts, including the Supreme Court, have held that parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale. Birdsell v. Shaliol, 112 U.S. 485, 488-89 (1884); Dowagiac Mfg. Co. v. Deere &

> Webber Co., 284 F. 331, 337 (8th Cir. 1922). Each joint tort-feasor is liable for the full amount of damages (up to a full single recovery) suffered by the patentee. Birdsell at 488-89; Dowagiac at 337. Entry of judgment against one infringer does not automatically release other related infringers. Sherman, Clay & Co. v. Searchlight Horn Co., 225 F. 497, 500 (9th Cir. 1915) ("There may be as many causes of action as there are joint tort-feasors, and as many recoveries, but there can only be one satisfaction."). This court agrees with and adopts this rule.

Id. Thus, in Shockley this court recognized that in patent infringement cases each joint-tortfeasor is liable for the full amount of damages up to a full single recovery, and that there may be as many causes of action as there are joint-tortfeasors. But this court did not authorize patentees to sue joint-tortfeasors (as an indirect infringement suit against Glenayre amounts to here) once damages accounting for their use has already been accepted. In short, the Shockley decision did not in any way overrule any of the various doctrines that prevent parties from collaterally challenging final judgments.

The views the four justices expressed in Part IV of Aro II also do not undermine our holding that Jackson cannot seek to recover a second damages award based on Glenayre's customers' infringement of the '900 patent. The justices made clear that when a patentee receives full compensation from a manufacturer for the infringing activities of the manufacturer and its customers, the patentee cannot collect further payment from a party alleged to contribute to the same infringing activities. They also identified the test that must be used to determine whether a party has been fully compensated: the compensation received must be compared to the amount of money the patentee would have made had the infringers not infringed. To conduct this comparison, of course, a court must assume that the patentee was never compensated by the infringers in the first place. And while the court cannot consider money that the patentee might have been able to earn by violating antitrust and patent misuse laws, it

can consider money the patentee lost in the form of prolongation of infringing use, and it can consider punitive or "increased" damages under 35 U.S.C. § 284. Importantly, however, the justices recognized that where a patentee has enforced its patent against a direct infringer and collected damages sufficient to put him in the same position he would have been in had there not been infringement, the patentee cannot thereafter collect actual damages from an alleged indirect infringer. Moreover, the justices made clear that when the patentee has collected payment by a direct infringer under a judicial decree calculated as a full compensation, as opposed to a private release, there can be no question that the payment represented full compensation for the infringing use.

Here, we do not confront a situation that involves an allegation of contributory infringement resulting in prolongation of infringing use. Moreover, because Jackson collected payment by Glenayre under a judicial decree for full royalties, there can be no question that the payment represented full compensation for the infringing use.

d.

For the reasons we have discussed, none of the Supreme Court cases cited by Jackson calls for a different result in this case. It is true, of course, that an award of damages for particular infringing acts, unlike a comprehensive license, does not automatically entitle the infringer or others to continue infringing conduct in the form of additional sales or uses of infringing products throughout the life of the patent. But in this case, the theory of recovery Jackson presented at the first trial was based on a reasonable royalty for past manufacture and sale of infringing products by Glenayre and, importantly, past benefits derived from use of the same products by Glenayre's customers. The district court considered that theory and found that that reasonable

royalty is, at most, $2.65 million. Jackson accepted that award of damages. Therefore, the district court was correct to conclude that, as a matter of law, the damages award, once collected, fully compensated Jackson for direct infringement by Glenayre, direct infringement by Glenayre's customers, and indirect infringement by Glenayre based on Glenayre's customers' direct infringement.[9]

## CONCLUSION

Had Jackson refused the district court's remittitur, the case would be in a very different procedural posture. Because he accepted the remittitur, however, Jackson may not relitigate the issue of whether Glenayre can be held liable for additional damages based on infringement by Glenayre's customers; the damages award he has accepted fully compensates him as a matter of law. Thus, Jackson is not entitled to a second trial on the issue of indirect infringement by Glenayre for Glenayre's customers' use of products purchased from Glenayre. The district court did not err in denying Jackson's motion to set trial.

## AFFIRMED

---

[9] We do not read the district court opinion to have granted the remittitur in order to exclude damages flowing from customer sales. Clearly, if that had been the district court's reasoning, the situation would be quite different.

# United States Court of Appeals for the Federal Circuit

04-1568

GLENAYRE ELECTRONICS, INC.,

Plaintiff-Appellee,

v.

PHILLIP JACKSON and PMJ FAMILY LIMITED PARTNERSHIP,

Defendants-Appellants.

NEWMAN, Circuit Judge, dissenting.

The court today holds that Jackson, the defendant in this declaratory action, was required to refuse the remittitur in order to preserve the issue of damages based on the unlitigated counterclaims. The court holds that Jackson's "failure to refuse the remittitur requires that we reject his collateral attack on that judgment in this appeal." Maj. op. at 9. However, he is not collaterally attacking that judgment, which was in his favor.

The remittitur limited damages to a reasonable royalty for Glenayre's direct infringement, and did not apply to the severed counterclaims relating to indirect infringement. The judgment that was subject to the remittitur is the judgment after the jury trial, a trial that was limited to Glenayre's direct infringement. That judgment was appealed by Glenayre, not Jackson. That judgment and the remitted damages for Glenayre's direct infringement are not under collateral attack by Jackson. The judgment on the jury verdict of

Glenayre's infringement, and the remitted damages, were affirmed by the Federal Circuit, Glenayre Electronics, Inc. v. Jackson, No. 03-1619, 95 Fed. Appx. 344 (Fed. Cir. April 8, 2004) (Table), and are not at issue.

This appeal relates solely to the stayed counterclaims for Glenayre's contributory and induced infringement based on direct infringement by Glenayre's customers. These counterclaims were excluded from the jury trial. The district court decided, after this court affirmed the Rule 54(b) judgment of direct infringement, to dismiss the counterclaims without further proceedings. The district court, today affirmed by the panel majority, incorrectly held that there cannot be contributory infringement by a direct infringer. From this ruling and its flawed premises, I respectfully dissent.

## A

At the jury trial that was the subject of the first appeal to this court, Jackson's counterclaims for indirect infringement were severed and stayed by the district court, and the jury's damages award was remitted to a sum measured only by Glenayre's direct infringement. Jackson then sought to pursue the severed counterclaims that were based on infringement by use and resale of the MVP System by the telephone service providers. The district court stated, incorrectly, that direct and contributory infringement are "just other sides of the same coin," and refused further process. The panel majority's statement that "Jackson recognized that the remitted award was based on Glenayre's customers' use," maj. op. at 16, is contrary to the record of the trial, the district court's statements, the post-trial motions, and the record of the Rule 54(b) appeal.

Jackson initially filed suit against only the telephone service providers, charging them with direct infringement of the '900 patent. Glenayre was not charged in that suit.

04-1568                                                2

Glenayre then filed a separate declaratory action against Jackson. Upon Jackson's challenge to Glenayre's declaratory standing, Glenayre stated that it is the manufacturer of the MVP System used by the phone service providers and that it is "the real party in interest rather than [having] a multitude of suits against its customers." The district court accepted Glenayre's declaratory suit; Jackson filed counterclaims in the declaratory action charging Glenayre with contributory infringement and inducement to infringe the Jackson patent; and Jackson's infringement suit against the telephone service providers was withdrawn. Then, on the district court's observation that "the need to determine damages against a contributory infringer/inducer only arises once it is determined that a direct infringement has taken place," the district court limited the jury trial to direct infringement by Glenayre. In staying the counterclaims for indirect infringement, the district court stated: "Glenayre's liability as an alleged contributory infringer/inducer depends, as a matter of law, on the logically prior determination of liability against one or more infringers (i.e. Glenayre's customers)." The court explained that "the question of the measure of damages against Glenayre as an alleged contributory infringer/inducer will not present itself until final judgment is rendered in this case." Glenayre Electronics, Inc. v. Jackson, No. 02-256 (N.D. Ill. Sept. 27, 2002).

In Glenayre's post-trial motion to the district court, Glenayre pointed out that "claims directed to the customer's use of the MVP have been stayed," and objected to the jury's damages award. Glenayre's Motion for JMOL or a New Trial, at 9. The district court agreed, and ruled that the maximum royalty for Glenayre's infringement would be 6% of Glenayre's sales, and proposed a remittitur to $2,650,000. See Unisplay, S.A. v. Am. Electronic Sign Co., Inc., 69 F.3d 512, 519 (Fed. Cir. 1995) (in calculating a remittitur, the

amount should be the maximum that the jury could have awarded).  Jackson accepted the remittitur to damages based solely on Glenayre's infringing sales, and the district court stated that "[b]ecause additional claims, dependent on the finality and affirmance of the patent infringement against Glenayre, remain for adjudication ," the court was certifying the judgment under Rule 54(b).  Glenayre, (N.D. Ill. July 22, 2003).

After the Federal Circuit affirmed, the district court changed its position and dismissed the counterclaims, acknowledging that its previous orders "carried some ambiguity as to the continuing viability of Jackson's counterclaims," and that the proceedings that had been conducted "contemplate the possibility of additional claims." However, the court now ruled that Jackson had been "completely compensated for direct infringement" and that "[o]nce this has occurred, there is nothing more that is owed. Contributory and inducing infringement are just other sides of the same coin."

I do not say that a court cannot change its mind; but the panel majority errs in stating that Jackson somehow waived his right to pursue the counterclaims for contributory infringement when he accepted the remittitur directed to Glenayre's direct infringement. The panel majority misperceives the issue when it states that "Jackson cannot show that the district court 'lost sight' of its own plan and procedure when he cannot show that the district court actually had a plan and procedure to hold a second trial regardless of the outcome of the first."  Maj. op. at 12.  That was not the district court's position.  To the contrary, as the district court stated, the second trial would be held only if the outcome of the first were that the MVP System infringed Jackson's patent, and the Federal Circuit affirmed that judgment under Rule 54(b).  The second trial was directly dependent on the

outcome of the first.  The issue is not whether the district court can change its position; the issue is whether it was correct in doing so.

**B**

Jackson states that the infringing application, resale, and use of the MVP System by the telephone service providers incurred liability for which Jackson was not compensated by Glenayre's damages as remitted.  The district court made no findings, adduced no evidence, and created no record on the issues of infringement by the phone service providers and whether Jackson had been adequately compensated therefor; the court simply dismissed the severed counterclaims.

Precedent establishes that a damages award against a manufacturer does not automatically include a paid-up license for infringing operations by the manufacturer's customers; that is a factual question, turning on the adequacy of the compensation.  See 35 U.S.C. §284 (damages shall be "adequate to compensate for the infringement"). Jackson points out that Glenayre took responsibility for the infringement liability and damages due to its customers' use of the MVP System, when it filed this declaratory action.  Glenayre's declaratory action proceeded on the premise that the counterclaims concerning infringement by Glenayre's customers would be taken up after determination of whether there was direct infringement by Glenayre.

The rule that there cannot be contributory infringement or inducement to infringe without a finding of direct infringement does not mean that the indirect infringer must also be a direct infringer.  The rule is that the patent must be shown to be directly infringed, usually by a third person who is not before the court, before the patentee can seek damages from the entity that induced or contributed to that direct infringement.  See

<u>Dynacore Holdings Corp. v. U.S. Philips Corp.</u>, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement."); <u>see</u> <u>generally</u> <u>Chisum on Patents</u> §17.01 ("Indirect infringement refers to . . . inducing or contributing to direct infringement by other persons.")

Despite the district court's initial premise that Jackson's counterclaims for indirect infringement would be taken up if direct infringement by the MVP System were found, on remand the district court held that there can be no liability for contributory infringement when the manufacturer is liable for direct infringement. That is an inapt statement of the law, for, as precedent shows, whether such liability exists depends on the particular facts of the infringement and the adequacy of the compensation. The panel majority departs in major ways from precedent, in holding that, as a matter of law, there is no liability for a manufacturer's contributory infringement, or even for direct infringement by users of an infringing device, when damages have been accepted that are limited to the manufacturer's direct infringement. Precedent is directly contrary. In <u>Aro Mfg. Co. v. Convertible Top Replacement Co.</u>, 377 U.S. 476 (1964) (<u>Aro II</u>), the Supreme Court discussed the positions of direct and contributory infringers as joint tortfeasors, and explained that the common law rule that release of one joint tortfeasor releases all tortfeasors does not apply in cases of contributory infringement. The Court held that the provider of the unpatented convertible automobile top was a contributory infringer, and that when the patented combination was licensed to the direct infringer (the Ford Motor Company) additional liability of the contributory infringer depended on the license terms and whether the payment from Ford

was adequate compensation for the infringement. The Court held that it was necessary to determine whether the license fee paid by Ford provided "full payment for the infringing use." 377 U.S. at 503. The Court did not hold that there can never be additional liability of the contributory infringer. The panel majority misconstrues Aro II.

The Court in Aro II cited Birdsell v. Shaliol, 112 U.S. 485 (1894), where the Court held, inter alia, that since a purchaser of an infringing machine can be restrained from continued use of the machine, the purchaser may be liable for damages for such use unless "full satisfaction" was provided to the patentee by the manufacturer. The Court explained that payment of damages by the infringing manufacturer does not automatically free the device from the patent, in the same way as would an authorized first sale by a patentee or licensee. "An infringer does not, by paying damages for making and using a machine in infringement of a patent, acquire any right himself to the future use of the machine." Birdsell, 112 U.S. at 487. The payment of damages by an infringer "does not ordinarily confer, upon him or upon others, the right to continue or repeat the wrong." Id. at 488. An infringer is not an authorized seller whose wares are free of the patent after first sale. The Court left no uncertainty:

> No more does one, who pays damages for selling a machine in infringement of a patent, acquire for himself or his vendee any right to use that machine. In the case of a license or a sale by the patentee, the rights of the licensee or the vendee arise out of contract with him. In the case of infringement, the liability of infringers arises out of their own wrongful invasion of his rights. The recovery and satisfaction of a judgment for damages against one wrongdoer do not ordinarily confer, upon him or upon others, the right to continue or repeat the wrong.

Birdsell, 112 U.S. at 487-88 (citations omitted). The Court established that while sales by the patentee or an authorized licensee can trigger the first sale doctrine, the collection of

damages for infringement does not. Payment of damages by an infringing manufacturer is not an automatic "implied license" to itself or others to continue the infringement.

Birdsell does not "suggest," as the panel majority postulates, that "recovery of actual damages, rather than nominal damages, from a maker and seller of a product would bar a suit against a buyer and user of the same product." Maj. op. at 23. To the contrary, Birdsell is explicit that such a bar arises "only . . . when actual damages have been paid, and upon the theory that the plaintiff has been deprived of the same property by the acts of two wrongdoers, and has received full compensation from one of them." Birdsell, 112 U.S. at 489. The question of whether Jackson has received "full compensation from one of them" has not yet been tried; it remains unlitigated in the severed counterclaims.

In Aro II the Court remanded for determination of the adequacy of the compensation already received by the patent owner, since "the amount paid by Ford under the agreement was expressly stated to include compensation for the use of the patented structures by Ford's purchasers." 377 U.S. at 499. In Aro II "the damages paid were expressly stated to be compensation for use of the device," 377 U.S. at 503, whereas here the telephone service providers' use of the Jackson invention was excluded from the damages paid. "Where a private release of past infringement which does not purport to release others is involved, the adequacy of the compensation must always be a question of fact." Aro II, 377 U.S. at 513. The panel majority directly contravenes precedent in ruling that "as a matter of law, Jackson has been fully compensated" for the infringement by the telephone service providers.

The Court's decisions are consistent in principle, arising in a variety of factual situations. In Union Tool Co. v. Wilson, 259 U.S. 107 (1922), the Court applied Birdsell to

the sale of spare parts for machines that had been sold before the trial court found them to be infringing. The Court observed that the patentee had not been compensated for use of these machines, and thus the manufacturer's sale of repair parts was in contempt of the injunction; the Court explained that since the patentee had not "received any compensation whatever for the infringement by use of these machines," the continuing use was unauthorized. Union Tool, 259 U.S. at 113. The Court found no "implied license" to use infringing machines. Id. The panel majority is incorrect in holding that the payment of damages for infringing manufacture includes "full rights" and license for ensuing uses and users "as a matter of law." Maj. op. at 26. Whether users and resellers who acquire the patented invention from an infringing manufacturer can incur liability for infringement and additional damages, is independent of whether the infringing manufacturer has already paid the judgment based on its own infringing manufacture.

**C**

Birdsell and Union Tool and Aro II establish that if the patentee was not fully compensated for the entirety of the infringement, additional compensation may be available based on the activity of other infringers. Although there cannot be more than a single full recovery, as discussed in Shockley v. Arcan, Inc., 248 F.3d 1349, 1364 (Fed. Cir. 2001) ("each joint tortfeasor is liable for the full amount of damages (up to a full single recovery) suffered by the patentee"), the patentee is not precluded from obtaining a full single recovery from the tortfeasors.

The Aro II Court explained that to recover damages from the contributory infringer it must be shown that the damages from the direct infringer are inadequate compensation. 377 U.S. at 509-10. Aro II confirmed the need to consider the totality of the infringement by

the manufacturer and its customers, and <u>Birdsell</u> and <u>Union Tool</u> established that the payment of damages by the manufacturer does not automatically release the infringing product for free use. Precedent teaches that no rigid rule either limits damages to the first link in the chain of infringing activity, or extends damages as of right. Precedent establishes that compensation for use of the infringing system may be sought if full compensation is not achieved, and that this question of fact warrants resolution. Whether the compensation awarded to Jackson upon remittitur was full compensation for the infringing activity by the telephone service providers is such a question of fact, and was raised by Jackson's severed counterclaims.

The parties and the district court understood, at the time the remittitur was offered and accepted, that the remitted damages were calculated as 6% of Glenayre's sales, and did not include damages for application and resale and use by the service providers. Ignoring the record, the panel majority makes the unsupported statement that the remitted damages are "based on a reasonable royalty for broad rights to his patent." Maj. op. at 9. The record mentions no "broad rights," and indeed negates the panel majority's postulate that the remitted damages included full royalty compensation for customers' infringement in the severed counterclaims. The severed counterclaims responded to Glenayre's voluntary action in placing itself in the shoes of the telephone service providers for purposes of their liability and damages as users of the MVP System. The district court erred in refusing to permit litigation of the adequacy of the damages to compensate for infringement by the

telephone service providers, and my colleagues err in their independently deduced theory of this case.[1]

## D

The panel majority states that by barring Jackson's counterclaims it is protecting Glenayre from multiple suits. That is not at issue. Glenayre was not sued by Jackson, but voluntarily brought this declaratory action; in turn, Jackson sought to resolve all of the issues in this declaratory action. The problem that the panel majority claims to have averted is not present. The problem is this appellate disposition of the merits, with the panel majority creating not only new law, but creating new arguments unavailable for response. For example, the panel majority states that "because Jackson collected payment by Glenayre under a judicial decree, there can be no question that the payment represented full compensation for the infringing use." To the contrary, the decree is directed to Glenayre's direct infringement as manufacturer, for this was the only issue at trial. The law is clear that damages from an infringing manufacturer do not automatically free all infringing operations by the manufacturer's customers. The issue for which Jackson

---

1      The panel majority states that "the remitted damages award that Jackson collected constitutes full compensation as a matter of law for (1) direct infringement of the '900 patent by Glenayre due to its manufacture and sale of infringing products; (2) direct infringement of the '900 patent by Glenayre's customers due to their use of products purchased from Glenayre; and (3) possible indirect infringement of the '900 patent by Glenayre due to its sale of infringing products and the resulting use of those same products by its customers." Maj. Op. at 9. This conflicts with the district court's statement that: "Here the direct infringement consisted of the manufacture and sale of Glenayre's MVP products to others. . . . But, by accepting money instead of seeking an injunction, for example, he has acquiesced in the use of the infringing goods by the infringer's customers." The district court well recognized that the remittitur did not include damages for the customers' use.

seeks remand is whether there has been adequate compensation for the entirety of the infringement. This is a question of fact, raised by the counterclaims and not yet decided.

The counterclaims were dismissed on an incorrect view of the law. Jackson is entitled to determination of this issue on the correct law. From my colleagues' contrary holding, I respectfully dissent.